## IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF MISSOURI
## WESTERN DIVISION

| | | |
|---|---|---|
| BRIAN J. DORSEY, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | Case No. 4:15-08000-CV-RK |
| | ) | |
| TROY STEELE, | ) | |
| | ) | |
| Respondent. | ) | |

## <u>ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS</u>

Before the Court is Petitioner Brian J. Dorsey's Petition for Writ of Habeas Corpus under 28 U.S.C. § 2254. (Doc. 25.) Also before the Court is Petitioner's motion to expand the record to include additional affidavits and for an evidentiary hearing. (Doc. 100.) For the reasons below, Petitioner's motion for leave to expand the record and for an evidentiary hearing is **DENIED**; the Petition is **DENIED**; a certificate of appealability is **DENIED**; and the case is **DISMISSED**.

### Background

The Supreme Court of Missouri stated the facts as follows on postconviction appeal:

> On December 23, 2006, Brian J. Dorsey's family was concerned that he was in trouble because of money he owed to drug dealers. He had called several family members asking to borrow money because there were two drug dealers in his apartment and he needed help. Mr. Dorsey's cousin, Sarah Bonnie, Sarah's husband Ben,[1] and two others went to Mr. Dorsey's apartment. The two drug dealers left Mr. Dorsey's apartment when his family arrived. The Bonnies then took Mr. Dorsey to their home, where they spent the evening drinking and playing pool in the Bonnies' "shop" with other family members and Darin Carel, a family friend. A shotgun had to be moved off the pool table before they could play pool. During the evening, Mr. Dorsey drank seven to ten beers.

> After everyone except Mr. Dorsey and Mr. Carel had left, the Bonnies went to bed. After Mr. Carel left, Mr. Dorsey found a bottle of vodka and drank some of it. He then retrieved the single-shot, 20-guage shotgun from the Bonnies' shop and fatally shot the Bonnies while they were in their bed. He then had sexual intercourse with Sarah's body. Afterward, he poured bleach on Sarah's torso and genital area and stole several items from the house, including Sarah's vehicle. Mr. Dorsey used some of the property to pay a debt for money he borrowed for drugs from Patricia Cannella and tried selling other stolen items, including the shotgun,

---

[1] Sarah Bonnie and Ben Bonnie will be referenced by their first names to avoid confusion. No disrespect is intended.

to various people throughout the night. He was driving a white car, which he said was his, and the property he was trying to sell was in the car. He was heavily intoxicated and had the bottle of vodka with him.

The next day, Sarah's parents became worried when the Bonnies did not show up for a family gathering. They went over to the Bonnies' house and found their four-year-old daughter, who told them that her parents had been locked in the bedroom all day. When Sarah's parents were able to get into the locked bedroom, they found the Bonnies dead.

A sexual assault kit was used to collect evidence from Sarah's body, and the vaginal swabs taken were sent to the Missouri State Highway Patrol crime laboratory for testing. A presumptive test indicated a possible, but unconfirmed, presence of sperm cells. A full autosomal DNA profile was then created from the swab.[2] The profile was consistent with Sarah's DNA, indicating she was the sole source of the DNA, and eliminated Mr. Dorsey as the source of the autosomal DNA. An extraction was then performed to target DNA on any Y chromosomes in the sample because only males have Y chromosomes. The Y-chromosome profile eliminated Ben and Mr. Carel, who had been at the Bonnies' house on the night of the murders, as the source of the DNA. It did not eliminate Mr. Dorsey as the source, however.

On December 26, Mr. Dorsey surrendered to police and admitted that he was "the right guy concerning the deaths of the Bonnies." Sarah's social security card was found in Mr. Dorsey's back pocket. Later that day, police found Sarah's car with some of the Bonnies' property still inside and the shotgun in the trunk. Ms. Cannella identified many of the items in the car as those Mr. Dorsey had been trying to sell on the morning of December 24. Mr. Dorsey was charged with two counts of first-degree murder. Chris Slusher and Scott McBride were hired by the office of the Missouri State Public Defender to represent Mr. Dorsey on these charges for a flat fee. Mr. Slusher was primarily responsible for investigating and preparing mitigation evidence, while Mr. McBride was primarily responsible for reviewing the DNA evidence.

In March 2008, Mr. Dorsey pleaded guilty to both counts. A jury trial was then held for the penalty phase. The jury recommended a sentence of death for each murder, finding both murders were committed while Mr. Dorsey engaged in the commission of another unlawful homicide, committed for the purpose of receiving money or any other thing of monetary value, and involved depravity of mind and manner. The jury also found the murder of Sarah was committed while Mr. Dorsey was engaged in the crime of rape. The trial court sentenced Mr. Dorsey accordingly.

---

[2] A full autosomal profile consists of 15 loci with presumably two alleles for each locus. A full autosomal profile essentially acts as an absolute identification of an individual because it is expected to be found only once in every 15 quadrillion people.

*Dorsey v. State*, 448 S.W.3d 276, 281-82 (Mo. banc 2014). The Supreme Court of Missouri affirmed on direct appeal, *State v. Dorsey*, 318 S.W.3d 648, 651-52 (Mo. banc 2010), and again on appeal from the denial of postconviction relief, *Dorsey v. State*, 448 S.W.3d at 301.

Petitioner then filed this § 2254 Petition, and the State responded. (Doc. 25; Doc. 29.) After several briefing extensions and a stay pending further state proceedings on Claim 26 under *Rhines v. Weber*, 544 U.S. 269 (2005), Petitioner filed a traverse (Doc. 86), and counsel presented oral arguments on the issue of procedural default (Doc. 95). In a separate order, the Court denied Claim 5 as procedurally defaulted. (Doc. 98.) The remaining 27 claims are now ready for decision.

### Discussion

For the reasons below, Petitioner's remaining claims either are procedurally defaulted or fail on the merits.

### I.     Failure to Subject the State's Case to Meaningful Adversarial Testing (Claim 1)

In Claim 1, Petitioner argues that his trial counsel failed to meaningfully contest the State's case under *United States v. Cronic*, 466 U.S. 648 (1984) because they did not investigate guilt. Petitioner concedes this claim is procedurally defaulted because he did not raise it in state court. (Doc. 25, Pet. at 173.) To excuse the default, he must show either "cause and actual prejudice" or "actual innocence." *Murphy v. King*, 652 F.3d 845, 849-50 (8th Cir. 2011). Petitioner argues there is cause to excuse the default under *Martinez v. Ryan*, 566 U.S. 1 (2012), because his postconviction counsel was ineffective for not raising this claim. (Doc. 25, Pet. at 173.) The Court disagrees.

To excuse a procedural default under *Martinez*, the underlying claim of ineffective assistance of trial counsel must be "substantial," and postconviction counsel must have been constitutionally ineffective with respect to the claim. *Martinez*, 556 U.S. at 14. A claim is "substantial" if it has "some merit" and "insubstantial" if "it does not have any merit or . . . is wholly without factual support." *Id.* at 14-16; *Kemp v. Kelley*, 924 F.3d 489, 499 (8th Cir. 2019).

Here, Petitioner's *Cronic* claim does not rise to the level of a substantial claim under *Martinez*. Ordinarily, an ineffectiveness claim requires showing deficient performance and prejudice. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). *Cronic* excuses the need to show *Strickland* prejudice under certain circumstances, including when counsel "failed to function in any meaningful sense as the Government's adversary." *Cronic*, 466 U.S. at 666. To meet this

standard, counsel's failure must have been "complete" throughout an entire proceeding, not only at various points. *Bell v. Cone*, 535 U.S. 685, 696-98 (2002).

Petitioner's *Cronic* claim is refuted by the record. Mr. Slusher, one of Petitioner's two trial lawyers, testified at the postconviction hearing that the public defender's office had already done substantial work on the case before he and Mr. McBride were retained to defend the case. (Doc. 29-11, PCR Tr. at 584-87.) The discovery file in their possession included police reports containing overwhelming evidence of guilt. (Petition Appendix ("Pet. App.") at 1-627.) Specifically, several witnesses placed Petitioner at the Bonnies' house on the night of the murders. (*Id.* at 7, 11-14, 21.) Darin Carel told police that only Petitioner was there with the Bonnies when he left. (*Id.* at 49-50.) The Bonnies' four-year-old daughter, J,[3] told police that Petitioner came into her room after she fell asleep and, when she asked about her parents, told her she couldn't see them. (*Id.* at 55-56, 353-54.)

The next morning at 4:00 a.m., according to several witnesses' statements to police, Petitioner showed up at Patricia Cannella's home in what appeared to be Sarah Bonnie's white car. He was apparently attempting to sell the Bonnies' property to pay off his drug debt, including two guns, a ring inscribed with the names Sarah and Brian (Brian was also the name of Sarah Bonnie's ex-boyfriend), Ben Bonnie's cell phone, and Sarah's car. (*Id.* at 8, 45, 315-19, 340-41, 361-62, 397-401, 431, 618-19, 626-27.) Police later discovered the car abandoned with several things in it that were usually kept in the Bonnies' house—including the murder weapon. (*Id.* at 88-91, 266-69.) Lab reports showed Petitioner's DNA was consistent with DNA found on the steering wheel of the car, cigarette butts near where the car was found, and vaginal swabs from Sarah Bonnie. (*Id.* at 513-15.)

On December 26, 2018, Petitioner voluntarily turned himself in to the police. (*Id.* at 117, 120-21.) He had Sarah Bonnie's Social Security card in his back pocket. (*Id.* at 130.) In response to questioning, he told police that he was the "right man concerning the death of the Bonnies." (*Id.* at 119-21.)

According to Mr. Slusher, "it didn't take [him] long to review the case and feel like the guilt phase of the case was going to be difficult." (Doc. 29-11, PCR Tr. at 587.) Nonetheless, he deposed four police officers and moved to suppress Petitioner's incriminating statements. (Doc. 25-2 at 2; Pet. App. at 5051-5154; Doc. 29-1, Motion to Suppress Hearing Tr. at 1-74; 29-3

---

[3] The Court has abbreviated the name of the Bonnies' daughter throughout this Order.

4

at 64-90.)  After the trial court denied the motion to suppress, trial counsel assessed "the evidence of guilt [as] overwhelming" and concluded that "the best trial strategy to avoid the death penalty was . . . to accept responsibility, which included pleading guilty." *Dorsey v. State*, 448 S.W.3d at 291; (Doc. 29-11, PCR Tr. at 588-89.)  According to Mr. Slusher, the specific reason for advising Petitioner to plead guilty was to gain "credit for acceptance of responsibility." (Doc. 29-11, PCR Tr. at 589.)  This was coupled with a strategy of advising Petitioner to take the witness stand to establish a human connection, show remorse, and plead for mercy. (Doc. 29-11, PCR Tr. at 588-89, 595, 697, 731-32.)

Trial counsel did not violate *Cronic* by not investigating guilt further.  They took affirmative steps on Petitioner's behalf at the guilt stage despite the overwhelming evidence of guilt.  When those efforts failed, they reasonably decided it was best to focus on obtaining a life sentence.  This was not a total failure to function as the State's adversary during the guilt phase. *See Florida v. Nixon*, 543 U.S. 175, 189-92 (2004) (permissible under *Cronic* to concede guilt during the guilt phase at trial and focus on the penalty phase); *Holder v. United States*, 721 F.3d 979, 987-89 (8th Cir. 2013) (same).  *Cf. Mulero v. Thompson*, 751 F. Supp. 2d 1009, 1025-26 (N.D. Ill. 2010) (permissible under the less-demanding *Strickland* standard to advise a capital defendant to plead guilty open to the death penalty and focus on the penalty phase); *Davis v. Polk*, No. 1:05CV29W, 2007 WL 2898711, at *23 (W.D.N.C. Sept. 28, 2007) (same).

Trial counsel also did not violate *Cronic* during the penalty phase.  At trial, they presented an opening statement, cross-examined several of the State's witnesses, called several witnesses in mitigation, and presented a closing argument—all of which focused on the acceptance-of-responsibility strategy.  (*See* Doc. 29-1 and Doc. 29-2, Trial Tr.)  Petitioner now claims counsel should have done certain things differently during trial.  (Doc. 25 at 166-73.)  These are not arguments that "counsel failed to oppose the prosecution throughout the . . . proceeding as a whole, but that [they] failed to do so at specific points."  *Bell*, 535 U.S. at 697.

Therefore, Claim 1 is insubstantial under *Martinez*, and postconviction counsel could not have been ineffective for not pursuing it.  Claim 1 will be denied as procedurally defaulted.[4]

---

[4] To the extent Claim 1's various subparts can be construed as independent *Strickland* claims, as the State suggests, they are addressed below in conjunction with Petitioner's other claims.

II.        **Conflict of Interest from the Flat-Fee Agreement (Claim 2)**

In Claim 2, Petitioner argues that trial counsel's flat fee of $12,000 per lawyer ($24,000 total) created a conflict of interest under *Cuyler v. Sullivan*, 446 U.S. 335 (1980) that encouraged them to do as little as possible and resulted in an inadequate investigation. This claim was properly raised in state court and is preserved for review on the merits under § 2254. (Doc. 29 at 13, 65.)

Under § 2254, the Court analyzes whether the last state-court decision that provides a relevant rationale (1) "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States;" or (2) "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); *Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018).

A.        **Unreasonable Application of Clearly Established Law (§ 2254(d)(1))**

As a threshold matter, the state court did not violate "clearly established" Supreme Court precedent. "*Cuyler* . . . has not been extended by the Supreme Court beyond cases in which an attorney has represented more than one defendant, and [the Eighth Circuit] has never determined whether it should be applied to other cases." *Winfield v. Roper*, 460 F.3d 1026, 1039 (8th Cir. 2006) (citing *Mickens v. Taylor*, 535 U.S. 162, 175 (2002) (stating that *Cuyler* "does not clearly establish" that it applies outside the context of multiple representations)). Because the Supreme Court has called into question the viability of financial-conflict-of-interest claims and has not "squarely addresse[d]" or given a "clear answer" to whether a flat fee agreement can create an actual conflict under *Cuyler*, the state court did not violate clearly established law for purposes of § 2254(d)(1). *See, e.g.*, *Wright v. Van Patten*, 552 U.S. 120, 125 (2008).

Even if the Court were to look past the "clearly established" law requirement, the Supreme Court of Missouri's (i.e., the relevant "state court's") rejection of this claim was reasonable. Under *Cuyler*, a petitioner "must establish that an actual conflict of interest adversely affected his lawyer's performance." *Cuyler*, 446 U.S. at 350. Here, the state court concluded there was no actual conflict that affected trial counsel's performance for the following reasons: trial counsel's investigative decisions were based on a reasonable trial strategy of obtaining credit for acceptance of responsibility during the penalty phase; trial counsel could have pursued additional funds from the public defender's office for an investigator, an expert, or other resources if they saw fit; trial counsel's in-house investigator was salaried and was not paid from the flat fee; and there was no

evidence that trial counsel's instructions to the investigator were based on finances. *Dorsey v. State*, 448 S.W.3d at 300.

Petitioner does not cite any "contrary" Supreme Court case, so the analysis is confined to whether the state court's application of federal law was reasonable. *See Williams v. Taylor*, 529 U.S. 362, 412-13 (2000) ("Contrary to" means contrary to a Supreme Court holding on a question of law or on a materially indistinguishable set of facts.). Petitioner cites *State v. Cheatham*, 292 P.3d 318 (Kan. 2013), and *State v. Young*, 172 P.3d 138 (N.M. 2007). In *Cheatham* and *Young*, other state supreme courts held that flat fee arrangements created actual conflicts under the circumstances in those cases. The state court in this case was not bound by decisions of other states, and given the availability of additional investigative funds, it was reasonable to conclude that no actual conflict affected trial counsel's performance. *See United States v. Stitt*, 552 F.3d 345, 350-51 (4th Cir. 2008) (no conflict from a flat fee when additional funds were available for expenses); *Kerr v. Parsons*, 378 P.3d 1, 8 (N.M. 2016) (stating that *Young* is "cinched to its own facts" and refusing to categorically bar the use of flat fee contracts) (quotation marks and citation omitted); *United States v. Taylor*, 139 F.3d 924, 932 (D.C. Cir. 1998) ("[C]ourts generally presume that counsel will subordinate his or her pecuniary interests and honor his or her professional responsibility to a client.") (quotation marks and citations omitted). Accordingly, the state court's application of *Cuyler* was reasonable.

## B. Unreasonable Factual Determination (§ 2254(d)(2))

Petitioner argues that the state court unreasonably found there was no evidence of a financial motive during the investigation. He points to testimony from Mr. Slusher that he "couldn't afford to pay [the in-house investigator] to be working on the case for this fee and doing a lot of work on this case." (Doc. 29-11, PCR Tr. at 582.) However, the transcript provides additional context:

Q. What was [the in-house investigator's] role in the case?

A. Well, I think originally probably my goal was for him not to have a role in the case.

Q. And can you explain that?

A. Because of, you know, I couldn't afford to pay him to be working on the case for this fee and doing a lot of work on this case. I don't recall. I think we had discussions maybe with outside investigators at some point on this case. I don't recall.

> I believe there was somebody down in Springfield we had talked to, but I don't think we ended up hiring him. But I think the use of [the in-house investigator] came later, when I just felt that I needed to get things done, and he was close, and so I had him do things.

(*Id.*)

The fact that Mr. Slusher initially did not want his own in-house investigator to work on the case does not mean his investigative decisions were financially driven. He could have obtained funds from the public defender's office to hire an outside investigator but chose not to do so, and he only enlisted his own staff as the need arose later. Viewing this testimony in context, it was reasonable for the state court to find that there was no evidence of a financial motive behind trial counsel's investigative decisions.

Therefore, Claim 2 will be denied on the merits.

**III.      Ineffective Assistance for Failing to Advise Petitioner About the Consequences of Pleading Guilty (Claims 3 and 1(A)(6))**

In Claims 3 and 1(A)(6), Petitioner argues that his trial counsel was ineffective because they did not tell him "that, by entering his plea, he would also be waiving the right to hold the State to its burden of proving aggravating circumstances at his penalty trial." (Doc. 25 at 164-66, 178-82.) At oral argument, the parties disputed whether this claim was procedurally defaulted. (Doc. 95, Oral Arg. Tr. at 78-84.) However, the Petition concedes default (Doc. 25 at 182), and it appears from a review of the relevant parts of the record that this claim was not fairly presented in state court. *Interiano v. Dormire*, 471 F.3d 854, 856 (8th Cir. 2006) ("[A] federal habeas petitioner's claims must rely on the same factual and legal bases relied on in state court.") (quotation marks and citation omitted).

Petitioner seeks to invoke *Martinez* to excuse the default, but the underlying ineffective-assistance-of-trial-counsel claim is insubstantial. Trial counsel was not deficient for failing to tell Petitioner that pleading guilty would relieve the State of its burden of proving aggravating circumstances. This advice would have been incorrect. The State still had the burden of proving the aggravating circumstances at trial, as evidenced by the jury instructions that required finding at least one aggravating circumstance beyond a reasonable doubt before assessing a death sentence. (Doc. 29-3 at 181, 184, 188.)

Petitioner also argues that, because aggravating circumstances are given special importance as "elemental facts" that must be proven to a jury beyond a reasonable doubt under *Ring v. Arizona*,

536 U.S. 584 (2002), trial counsel had a duty under *Padilla v. Kentucky*, 559 U.S. 356 (2010) to advise him that pleading guilty under the circumstances of this case would have the *effect* of conceding the aggravating circumstances (i.e., for killing two people at once, for monetary gain, and during a rape). The Court disagrees.

This case is unlike the situation in *Padilla*, where plea counsel misadvised his client about the deportation consequences of pleading guilty. This case does not involve misadvice or a failure to advise Petitioner about the effect of his guilty plea. Here, the jury was not required to assess a death sentence just because it found aggravating circumstances exist. The jury was instructed that it could assess a life sentence if it determined that (1) there were no aggravating circumstances; (2) the mitigating circumstances outweighed the aggravating circumstances; or (3) death was not the appropriate punishment even though the mitigating circumstances did not outweigh the aggravating circumstances. (Doc. 29-3 at 181-86.) The trial strategy of accepting responsibility and pleading for mercy was aimed at steps two and three of the deliberations process—to obtain a life sentence *despite* the aggravators. Mr. Slusher testified during the state postconviction hearing that he discussed pleading guilty with Petitioner "over some period of time," advised him "about the options and the consequences of the options," and advised him that the defense needed "to take some chances" in light of the overwhelming guilt evidence. (Doc. 29-11, PCR Tr. at 589, 648-49.) The acceptance-of-responsibility strategy was part of Mr. Slusher's discussion with Petitioner. (*Id.* at 654.) Trial counsel was not deficient under *Padilla* even if he did not explain to Petitioner prior to pleading guilty that the details of carrying out the acceptance-responsibility-strategy would involve conceding aggravating circumstances.

This claim would also fail for lack of prejudice. To show prejudice, Petitioner "must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Hill v. Lockhart*, 474 U.S. 52, 59 (1985). Here, the guilt evidence was overwhelming, and there is not a reasonable probability Petitioner would have abandoned the strategy of accepting responsibility just because counsel told him the effect of pleading guilty would be to concede the aggravators.[5] *See Meyer v. Branker*, 506 F.3d 358, 369-

---

[5] In *Padilla*, the Supreme Court did not reach the prejudice prong of the *Strickland* test, but it stated as follows: "to obtain relief on this type of claim, a petitioner must convince the court that a decision to reject the plea bargain would have been rational under the circumstances." *Padilla*, 559 U.S. at 372, 374. To the extent this statement set forth a less stringent prejudice analysis for *Padilla*-type claims, the Court further concludes that it would not have been rational under the circumstances in this case for Petitioner to

70 (4th Cir. 2007) (no prejudice for a similar claim because there was overwhelming guilt evidence and a viable strategy of demonstrating remorse).

Therefore, Claims 3 and 1(A)(6) are insubstantial under *Martinez*, and postconviction counsel could not have been ineffective for not pursuing them. Claims 3 and 1(A)(6) will be denied as procedurally defaulted.

**IV.  Ineffective Assistance for Not Pursuing a Diminished Capacity Defense (Claims 4 and 1(A)(5))**

In Claims 4 and 1(A)(5), Petitioner argues that his trial counsel was ineffective for failing to understand and investigate the defense of diminished capacity. This claim was properly raised in state court and is preserved for review on the merits under § 2254. (Doc. 29 at 13, 65.)

"Diminished capacity" is a partial defense that negates the "deliberation" element of first-degree murder. *Zink v. State*, 278 S.W.3d 170, 178 (Mo. banc 2009). Deliberation is the "mental state that distinguishes first- and second-degree murder" and is "defined as 'cool reflection for any length of time no matter how brief.'" *Id.* (quoting Mo. Rev. Stat. §§ 565.002.3, 565.020.1). With this defense, a defendant may present evidence of a mental disease or defect to prove lack of capacity to deliberate. *Id.*

In this case, the state court concluded that counsel was not deficient based on the following facts. *Dorsey v. State*, 448 S.W.3d at 291-92. Prior to the guilty plea, trial counsel hired a neuropsychologist and psychologist to perform testing. The neuropsychologist found no serious mental disease or defect from an "organic defect." Trial counsel also obtained the case file from the public defender's office, which contained a large number of mitigation records showing a history of depression and the police reports discussed above that showed overwhelming evidence of guilt.

Although trial counsel considered pursuing a diminished capacity defense, they decided not to do so because they believed the overwhelming weight of the evidence was against it. Specifically, there was considerable evidence showing that Petitioner acted intentionally and with deliberation, including retrieving the single-shot shotgun from the barn; reloading it to kill Ben Bonnie; locking the bedroom door to keep the Bonnies' daughter out of the room; stealing their property so he could sell it; pouring bleach on Sarah Bonnie's body to cover up the evidence;

---

have abandoned the strategy of accepting responsibility just because counsel told him the effect of pleading guilty would be to concede the aggravators.

turning himself in to the police; and identifying himself as the one the police needed to talk to about the murders. Trial counsel was also aware that Petitioner was heavily intoxicated on the night of the murders and that voluntary intoxication alone could not be used to support a diminished capacity defense. Rather than pursuing a defense he believed would not work, Mr. Slusher advised Petitioner to plead guilty following a "fairly long process" to obtain credit for accepting responsibility. In light of these facts, the state court concluded that the "trial strategy to not pursue a diminished capacity defense—and, therefore, to not investigate further—was not unreasonable." *Id.* at 292.

The state court's application of *Strickland*'s deficiency prong was reasonable. Petitioner argues that trial counsel could have supported a diminished capacity defense if their psychologist had been given an opportunity to thoroughly examine Petitioner prior to the guilty plea. However, Mr. Slusher testified during the postconviction hearing that, as a practical matter, he did not think a diminished capacity defense would work. (Doc. 29-11, PCR Tr. at 674.) Based on the facts recited by the state court, it was reasonable for the state court to find no deficiency in this decision. *See Strickland*, 466 U.S. at 691 (stating that counsel has a duty to conduct reasonable investigations "or to make a reasonable decision that makes particular investigations unnecessary"); *Harrington v. Richter*, 562 U.S. 86, 105 (2011) ("The standards created by *Strickland* and § 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so.").[6] Claims 4 and 1(A)(5) will be denied on the merits.

## V.        *Brady* Violation for Suppressing DNA Evidence (Claim 5)

The Court already denied Claim 5 in a prior Order because Petitioner has not provided sufficient authority to expand *Martinez* to defaulted *Brady* claims. (*See* Doc. 98.)

---

[6] Petitioner also asserts that the state court unreasonably determined the facts with respect to this claim. (Doc. 86 at 14-19.) He then makes several legal arguments without identifying any of the facts on which the Supreme Court of Missouri based its decision. (*Id.*) This is insufficient to plead a claim under Rule 2(c) of the Federal Rules Governing § 2254 Proceedings. *See Adams v. Armontrout*, 897 F.2d 332, 334 (8th Cir. 1990) ("[A] petitioner must state specific, particularized facts which entitle him or her to habeas corpus relief for each ground specified," and the "facts must consist of sufficient detail to enable the court to determine, from the face of the petition alone, whether the petition merits further habeas corpus review.").

**VI.      Ineffective Assistance for Failure to Investigate DNA Evidence (Claims 6 and 1(A)(4))**

In Claims 6 and 1(A)(4), Petitioner argues that trial counsel failed to investigate the State's two DNA tests: an austosomal test and a Y-chromosome test (i.e., for male DNA).  The state court explained that an autosomal test "essentially acts as an absolute identification of an individual because it is expected to be found only once in every 15 quadrillion people." *Dorsey v. State*, 448 S.W.3d at 282 n.2.  This contrasts with a Y-chromosome match, which would occur for 2.3 out of every 1000 Caucasian males because all males who share a paternal ancestor have the same Y-chromosome profile. *Id.* at 286.

**A.      Autosomal Evidence**

Petitioner argues that an investigation of the autosomal DNA test would have led trial counsel to contest the rape on the ground that the State altered the results to exclude Ben Bonnie as a contributor to the vaginal swabs.  Petitioner failed to properly present this claim in state court. *Dorsey v. State*, 448 S.W.3d at 283-84.  Petitioner seeks to invoke *Martinez* to excuse the procedural default, but the underlying ineffectiveness claim is insubstantial under *Martinez* because Petitioner cannot show prejudice.

To show prejudice, Petitioner must show a reasonable probability that further investigation would have led him to insist on a guilt-phase trial or that the penalty phase would have resulted in a life sentence.  *See Strickland*, 466 U.S. at 694; *Hill*, 474 U.S. at 59.  In this case, the State's analyst observed only Sarah Bonnie's DNA during the routine DNA extraction process, but he also observed sperm cells on the vaginal swabs.  (Trial Tr. at 841-42; Pet. App. at 513.)  According to the analyst, this happened because "there was so much female DNA that it masked any male DNA that was there," which was "commonly seen in [his] laboratory."  (Pet. App. at 4985.)  So, the analyst developed a Y-chromosome profile from the DNA that was extracted from the vaginal swabs and tested it against Ben Bonnie, Darin Carel, and Petitioner.  (Trial Tr. at 842-45; Pet App. at 513.)  Ben Bonnie and Darin Carel were ruled out as contributors, but Petitioner was not.  (*Id.* at 845-47.)

Petitioner argues that trial counsel failed to uncover evidence that the State's analyst improperly removed two "allelic peaks" from the autosomal test results, which he claims would have matched Ben Bonnie.  The State disputes that it was improper to remove this information from the DNA test.  However, regardless of whether the tests were improper, and Ben Bonnie's

DNA was on the vaginal swabs, Petitioner still was not ruled out as a contributor to the Y-chromosome DNA found on the vaginal swabs. Given this, trial counsel would not have had a viable theory to contest the rape even if he had pointed out the alleged errors in the autosomal test. Accordingly, there is not a reasonable probability that investigating further would have led Petitioner to insist on a guilt-phase trial or led the jury to assess a life sentence. Because the autosomal parts of Claims 6 and 1(A)(4) lack merit, they are insubstantial under *Martinez*, and postconviction counsel could not have been ineffective for not pursuing them.[7]

### B. Y-Chromosome Evidence

Petitioner makes three arguments that trial counsel was ineffective for failing to discredit the Y-chromosome evidence, all of which lack merit.

#### 1. Failure to Investigate the Lack of a "Differential Extraction"

Petitioner first alleges that trial counsel should have investigated and pointed out the State's failure to perform a "differential extraction," which would have isolated the sperm cells for autosomal testing and confirmed who they belonged to. This claim is preserved for review under § 2254. (Doc. 29 at 64; Doc. 95, Oral Arg. Tr. at 46-48; Doc. 29-13, PCR Appellant's Br. at 43-64.) The state court held there was no prejudice from not investigating this issue because (1) Petitioner would have been prohibited from arguing an adverse inference from the State's failure to perform a particular test; (2) there was overwhelming evidence connecting him to the murders; and (3) evidence that the State could have performed a differential extraction would have made little difference, given that the jury already knew that the Y-chromosome test was not as "discriminatory" as an autosomal test. *Dorsey v. State*, 448 S.W.3d at 288.

This was a reasonable application of *Strickland*'s prejudice prong. First, under Missouri law, a defendant cannot generally draw an adverse inference from the State's failure to perform forensic testing. *Gray v. Larkins*, No. 4:08CV895-DJS, 2010 WL 840813, at *9 (E.D. Mo. Mar. 11, 2010); *Guinn v. Kemna*, No. 05-0632-CVWGAFP, 2005 WL 3078601, at *3-4 (W.D. Mo. Nov. 16, 2005), *aff'd*, 489 F.3d 351 (8th Cir. 2007); *State v. Schneider*, 736 S.W.2d

---

[7] Petitioner is not claiming that the alleged errors in the autosomal test also rendered the Y-chromosome test that potentially included Petitioner unreliable. In other words, even if Ben Bonnie was an autosomal match, the Y-chromosome test still did not exclude Petitioner. One might expect that if Ben Bonnie was an autosomal match, then he also should have been a potential Y-chromosome match. However, Petitioner's expert testified during the postconviction hearing that Ben Bonnie could have been an autosomal match while still being ruled out as a Y-chromosome match. (Doc. 29-11 at 416-17.)

392, 401-02 (Mo. banc 1987). Second, in addition to the overwhelming evidence connecting Petitioner to the murders, there was evidence of rape other than the DNA results, including evidence that Sarah Bonnie was clothed in only a T-shirt and that bleach had been poured on her midsection and groin. (Trial Tr. at 537, 672-76, 679, 685-87.) Third, it would have made little difference to point out the lack of a differential extraction, given that Petitioner could not be eliminated as a contributor to the Y-chromosome DNA that was on the vaginal swabs. Petitioner suggests that his skin or saliva cells might have innocently transferred to Sarah Bonnie's vagina from sex toys found in the bedroom. However, Petitioner does not allege that he touched the sex toys or that his DNA was found on them, and he provides no other explanation for how his cells could have innocently transferred to Sarah Bonnie's vagina. The State still could have argued that the more likely reason Petitioner's DNA was found on the vaginal swabs was rape, and the Court is not persuaded that the allegations in the Petition show a viable way to contest the rape.

Accordingly, it was reasonable for the state court to conclude that there was no prejudice from failing to investigate and raise the lack of a differential extraction. This part of Claims 6 and 1(A)(4) will be denied on the merits.

### 2. Contamination Within Evidence Kits

Petitioner next argues that trial counsel failed to investigate the biological evidence kits for Ben and Sarah Bonnie, which he alleges were compromised by blood vials that "exploded" inside the kits. This claim is procedurally defaulted and insubstantial under *Martinez* for lack of prejudice.

Lab reports show that the caps came off two blood vials inside Ben and Sarah Bonnies' evidence kits. (Pet. App. at 5034-35.) However, Petitioner fails to explain how this could have compromised the DNA tests that were performed. Petitioner does not allege that the State kept Petitioner's DNA sample in a location where the spill could have picked up his DNA and cross-contaminated the vaginal swabs prior to testing. The State's DNA analyst, Jason Wyckoff, testified during a pretrial deposition that he developed independent reference standards for Ben and Sarah Bonnie from sources other than the spilled vials. (*Id.* at 4968-77, 5032-33.) According to one of the autopsy analysts who testified at trial, the sexual assault kit utilized for Sarah Bonnie was in its own sealed box (Trial Tr. at 725-26), and the reports on the vaginal swabs and Petitioner's DNA sample do not show that they were compromised by the spill (Pet. App. at 3972-73, 4010, 4050-51, 4200).

Accordingly, there is not a reasonable probability that investigation of potential contamination in the evidence kits would have led Petitioner to insist on a guilt-phase trial or led the jury to assess a life sentence. Because these parts of Claims 6 and 1(A)(4) lack merit, they are insubstantial under *Martinez*, and postconviction counsel could not have been ineffective for not pursuing them. They will be denied as procedurally defaulted.

### 3. Other Forensic Evidence

Finally, Petitioner argues that trial counsel failed to investigate other forensic evidence that he claims would have discredited the Y-chromosome evidence: (1) the lack of blood on Petitioner's clothes when he turned himself in to the police; (2) the fact that he was eliminated as a contributor to the DNA test of the shotgun's "forearm" area; and (3) the fact that the police lifted fingerprints from the crime scene and Sarah Bonnie's car but never tested them. (Doc. 25 at 159-60.) These arguments are procedurally defaulted and insubstantial under *Martinez* due to lack of prejudice.

None of these arguments discredit the Y-chromosome evidence—they go to whether Petitioner was guilty of murder. For the reasons already discussed above, there was overwhelming evidence that Petitioner was the murderer. Furthermore, the evidence Petitioner cites does not show a reasonable probability of a different result. Petitioner's own statement was the only evidence that he was still wearing the same clothes two days after the murders. (Trial Tr. at 27-28.) Although the State recovered an unidentified person's DNA from the forearm area of the shotgun, and Petitioner was eliminated as a contributor for this DNA test, there was also not enough DNA on the shotgun's trigger or stock areas for testing. (Pet. App. at 3016.) This could suggest that Petitioner wiped it partially clean or allowed someone else to handle it when he was trying to sell it, or simply that someone else handled it prior to the murders. Finally, Petitioner does not say whose fingerprints he believes were at the crime scene or in the car, and the Court will not speculate about whether he would benefit from a fingerprint analysis that has not been conducted.

Accordingly, there is not a reasonable probability that investigation of these other forensic issues would have led Petitioner to insist on a guilt-phase trial or led the jury to assess a life sentence. Because these parts of Claims 6 and 1(A)(4) lack merit, they are insubstantial under *Martinez*, and postconviction counsel could not have been ineffective for not pursuing them. They will be denied as procedurally defaulted.

**VII.**        ***Brady* Violation for Suppressing Other CODIS Hits (Claim 7)**

In Claim 7, Petitioner argues that the State violated *Brady v. Maryland*, 373 U.S. 83 (1963) by suppressing evidence that CODIS (the Federal Bureau of Investigation's "Combined DNA Index System") generated Y-chromosome "hits" against people other than Petitioner for the vaginal swabs. This claim is preserved for review under § 2254. (Doc. 29 at 13, 65.) The state court rejected this *Brady* claim in part because the jury was already told about a CODIS hit to a man named John Sim, and the relevant additional CODIS hit to a man named Timothy Kathcart[8] did not create a "reasonable probability that the jury would have found [Petitioner] did not rape Sarah." *Dorsey v. State*, 448 S.W.3d at 285-86.

Petitioner first argues that the state court's decision was "contrary to" *Brady* because it focused on the probability that the jury would not have found a rape instead of the probability that the jury would have questioned the State's DNA evidence in general. (Doc. 25 at 216-18.) The phrase "contrary to" for purposes of § 2254 means contrary to a Supreme Court holding on a question of law or on a materially indistinguishable set of facts. *Williams*, 529 U.S. at 412-13. Here, the state court correctly recited the materiality standard as "a reasonable probability that the result would have been different" and rejected Petitioner's claim by addressing the crux of his argument. *Dorsey v. State*, 448 S.W.3d at 285; *see Strickler v. Green*, 527 U.S. 263, 280 (1999) (materiality standard). This was not "contrary to" *Brady*.

The state court also did not unreasonably apply *Brady*'s materiality standard. Petitioner argues that these additional CODIS hits were material because, although the jury heard about the CODIS hit to John Sim, the prosecutor falsely suggested Mr. Sim was incarcerated at all relevant times. The state court held that there was no prejudice from the failure to disclose the hit to Kathcart because (1) the jury heard evidence that 2.3 out of every 1000 males would not be ruled out by the Y-chromosome test, as evidenced by the hit to John Sim; (2) Petitioner could not have argued that Kathcart committed the rape without evidence directly connecting him to the crime; and (3) the connecting evidence proffered (i.e., that Kathcart owned a truck, and the Bonnies' neighbors heard a loud truck on the night of the murders) did not create a reasonable probability of a different result. *Dorsey v. State*, 448 S.W.3d at 286. This was a reasonable application of *Brady*'s materiality standard. The jury was told why the Y-chromosome test would not rule out

---

[8] The State suppressed four total CODIS hits, but the hits to the three other people did not register through CODIS until after trial.

other males, and the evidence connecting other CODIS hits to this crime was weak in comparison to the extensive evidence connecting Petitioner to the crime.

Finally, Petitioner argues that the state court's decision was contrary to *Holmes v. South Carolina*, 547 U.S. 319, 328-31 (2005), which struck down certain exclusionary rules that prohibited defendants from introducing evidence of third-party guilt. *Holmes* expressly ratified Missouri's third-party guilt rule because, unlike the South Carolina rule, it did not allow exclusion based on the strength of the State's case. *Id.* at 327 n.* Here, the state court noted that, "[w]ithout evidence directly connecting Kathcart to the crime," Petitioner would have been prohibited from introducing evidence that Kathcart committed the rape. *Dorsey v. State*, 448 S.W.3d at 286. The state court then concluded that Petitioner would not have been prejudiced even if this evidence could have been presented to the jury. *Id.* This was not contrary to *Holmes*. Therefore, Claim 7 will be denied on the merits.

## VIII.      Ineffective Assistance for Failure to Investigate Other CODIS Hits (Claim 8)

In Claim 8, Petitioner argues that trial counsel was ineffective for failing to investigate the CODIS hits referenced in Claim 7. The State concedes that this claim is preserved. (Doc. 29 at 13, 65; Doc. 29-13, PCR Appellant's Br. at 65.) Because the state court did not analyze this claim, the Court will review it *de novo*. *See Rompilla v. Beard*, 545 U.S. 374, 390 (2005) (reviewing for prejudice *de novo* because the state court addressed only deficiency and did not reach prejudice).

This claim fails for largely the same reasons as Claim 7: the jury was told why the Y-chromosome test would not rule out other males, and the evidence connecting the other CODIS hits to the crime was weak in comparison to the extensive evidence connecting Petitioner to the crime. Petitioner also argues that his guilty plea and sentence should be vacated because trial counsel was ineffective for failing to investigate suspicious deposition testimony from the State's DNA analyst, Jason Wyckoff. Mr. Wyckoff stated in his deposition that CODIS did not register a hit to Petitioner until after the prosecutor asked him to generate documents about it in April 2008. (Doc. 25 at 220-21; Pet. App. at 4997-5001, 5040-43.) However, lab records show that Petitioner's profile hit against the vaginal swabs on January 29, 2008, shortly after it was entered into the database on January 23, 2008. (Pet. App. at 3180, 3940; Doc. 29-11, PCR Tr. at 434, 436.) Accordingly, there is not a reasonable probability that further investigation into this issue would

have led Petitioner to insist on a guilt-phase trial or led the jury to assess a life sentence. Therefore, Claim 8 will be denied on the merits.

## IX. *Brady* Violation Regarding Impeachment Evidence of Patricia Cannella (Claim 9)

In Claim 9, Petitioner argues that the State suppressed evidence he could have used to impeach Patricia Cannella. This claim is procedurally defaulted. (Doc. 95, Oral Arg. Tr. 108-09; Doc. 29-13, PCR Appellant's Br.) Like Claim 5, Petitioner has not provided sufficient authority to expand *Martinez* to defaulted *Brady* claims. However, Petitioner also argues that there is cause for the default because the State suppressed this *Brady* evidence until it was too late for him to raise it in the state postconviction proceedings. (Doc. 86 at 29.) This would be enough to satisfy the "cause and prejudice" standard if Petitioner could show *Brady* materiality, *see Strickler*, 527 U.S. at 282, but he cannot show materiality in this case.

The impeachment evidence at issue consists of (1) prior convictions and police reports showing Cannella's illegal activities and (2) evidence that the prosecution treated her favorably during her own criminal case. (Pet. App. at 4660-4945.) Petitioner claims trial counsel could have used this to show that Cannella was lying when she testified that she did not sell drugs to Petitioner. However, impeachment on this basis would not have had a significant impact on the case. Although Cannella denied selling Petitioner drugs, both the prosecutor and Petitioner himself pointed out that he obtained drugs from Cannella. (Trial Tr. at 888, 949.) Furthermore, Cannella gave largely cumulative testimony. She testified that she loaned Petitioner money for drugs and that he tried to pay it back by selling property later identified as the Bonnies'. (Trial Tr. at 603-10.) The State also put on two other witnesses who said they helped remove drug dealers from Petitioner's apartment the day of the murders and two other witnesses who said Petitioner attempted to sell the Bonnies' property the next morning. (*Id.* at 581, 596-97, 617-20, 627-34.) Cannella's testimony was far from "pivotal," as Petitioner suggests. (Doc. 25 at 241-42.)

Petitioner also argues that trial counsel could have accused Cannella and her suspected associate, Kelvin Swift, of being the murderers or acting as Petitioner's accomplices. However, Petitioner has not sufficiently linked Cannella or Swift to the crime. Petitioner does not allege that Swift's DNA was consistent with the vaginal swabs. He argues that Cannella was seen in a truck on the day of the murders and that the Bonnies' neighbors heard a loud truck that night. This

connection is tenuous at best and insufficient to link Cannella and Swift to the crime. In contrast, there was considerable evidence that Petitioner was involved in the murders, including his own admissions to police and the fact that the Y-chromosome test did not exclude him as a contributor to the Y-chromosome DNA found on Sarah Bonnie's vaginal swabs.

Petitioner points to (1) four-year-old J's statement to police that she heard people open the front door and come into the house, that a "monster" killed her parents, and that Petitioner was a good man who helped her; and (2) a juror's affidavit stating that this testimony could have changed his mind if it were presented.[9] (Pet. App. at 55-56, 350-59.) However, J did not identify Cannella or Swift or tell police that she saw anyone except Petitioner, and the officers were convinced she had "either been told, or overheard, many of the details regarding this issue." (*Id.* at 56.) Furthermore, the juror's affidavit is inadmissible to impeach the verdict. *See* Fed. R. Evid. 606(b)(1) ("During an inquiry into the validity of a verdict . . . a juror may not testify about . . . the effect of anything on that juror's or another juror's vote . . . or any juror's mental processes concerning the verdict . . . ."); *Warger v. Shauers*, 135 S. Ct. 521, 527 (2014) (describing "the rule against jurors' impeaching their verdicts"); *Strickland*, 466 U.S. at 695 ("[E]vidence about the actual process of decision, if not part of the record of the proceeding under review, . . . should not be considered in the prejudice determination.").

Accordingly, there is not a reasonable probability that this impeachment evidence would have led Petitioner to insist on a guilt-phase trial or led the jury to grant a life sentence. Because Petitioner cannot show prejudice on Claim 9, this claim will be denied as procedurally defaulted.

## X.     Ineffective Assistance for Failure to Investigate Patricia Cannella (Claims 10, 1(A)(1), and 1(A)(2))

In Claims 10, 1(A)(1), and 1(A)(2), Petitioner argues that trial counsel was ineffective for not investigating Cannella and uncovering the impeachment evidence at issue in Claim 9. These claims are procedurally defaulted. (Doc. 95, Oral Arg. Tr. at 7-8, 11-13.) *Strickland* prejudice and *Brady* materiality follow the same test, so these claims lack merit for the same reasons as Claim 9. Therefore, these claims are not substantial under *Martinez*, and postconviction counsel

---

[9] The juror's affidavit states as follows, in relevant part: "I never heard any evidence that the daughter saw the murderer. We assumed that she had never seen anything. . . . I never heard any evidence that the daughter told a social worker that 'BJ was a good man and BJ helped me.' I never heard any evidence that the daughter told the social worker that a monster killed her parents. Hearing this evidence could have changed my opinion. We were looking for a reason to spare Brian Dorsey's life." (Pet. App. at 5468.)

could not have been ineffective for not pursuing them.  Claims 10, 1(A)(1), and 1(A)(2) will be denied as procedurally defaulted.

## XI.　Ineffective Assistance for Failure to Investigate and Present Mitigation Evidence of Substance Abuse and Family Health History (Claim 11)

Petitioner argues in Claim 11 that trial counsel should have investigated, developed, and presented mitigation evidence of his substance abuse history, his relatives' substance abuse history, and his relatives' physical and mental health history.  (Doc. 25 at 263, 267-68.)  This claim is preserved in part.　(Doc. 29 at 13-14, 62, 64; Doc. 95, Oral Arg. Tr. at 60-62; PCR Appellant's Br., Doc. 29-13 at 95-97.)

Specifically, Petitioner argued to the state court that trial counsel should have set up meetings between his family and his retained psychologist, Dr. Robert Smith.  *Dorsey v. State*, 448 S.W.3d at 292-93.  He argued that this would have led trial counsel to uncover evidence that his depression predated his substance abuse and that he was genetically predisposed to depression and substance abuse.  The state court rejected this claim for lack of prejudice because (1) Dr. Smith's psychological summary, which was admitted into evidence, detailed Petitioner's family history of depression and substance abuse, his genetic susceptibility to addiction, and signs of childhood depression; and (2) although interviews with Petitioner's parents "may have made clearer the extent of alcoholism and depression in [Petitioner's] family and [Petitioner's] depression at an early age, . . . Dr. Smith was aware of these facts at the time of the penalty phase and had even concluded that [Petitioner] was genetically predisposed to alcohol and substance abuse." *Id.* at 293.

The Court believes the first reason[10] given by the state court was reasonable and sufficient under *Strickland*'s prejudice prong.　*See Williams*, 529 U.S. at 365 ("[A]n *unreasonable* application of federal law is different from an *incorrect* application of federal law.").  During deliberations, the jury had access to and specifically asked for Dr. Smith's report, which described Petitioner's childhood depression and dysfunction at home, his father's depression and alcoholism, other family members' substance abuse, and Petitioner's genetic susceptibility to substance abuse.

---

[10] The state court's second reason to reject this claim focuses more on a collateral issue rather than the critical issue under the prejudice prong.  The issue is not whether Dr. Smith already knew about the details of Petitioner's history but whether there is a reasonable probability that *presenting* this mitigation evidence to the jury would have produced a different result.  *See Wiggins*, 539 U.S. at 534 ("In assessing prejudice, we reweigh the evidence in aggravation against the totality of available mitigating evidence.").

(Doc. 29-6, Psychological Report of Dr. Smith; Trial Tr. at 944, 1032-33.) Although presenting testimony from live witnesses on this issue might have been more impactful than presenting the facts in a cold report, there is not a reasonable probability that focusing on these specific issues would have produced a different result, given that substantial mitigation evidence was adduced of Petitioner's struggles with depression and substance abuse. Therefore, it was reasonable for the state court to reject this part of Claim 11 of prejudice grounds, and it will be denied on the merits.

Similar logic also applies to the unpreserved part of Claim 11, which simply raises more evidence of family health history than was raised in state court. This claim is insubstantial under *Martinez*. The proffered evidence includes the physical and mental ailments of many of Petitioner's distant relatives, which is of questionable relevance and attenuated at best. Although some of this evidence appears to be relevant (such as the mental health issues of closer family members), it adds little to the analysis beyond what the jury already knew from Dr. Smith's testimony and report. Accordingly, there is not a reasonable probability that presenting this evidence would have led the jury to assess a life sentence. Therefore, the unpreserved part of Claim 11 is insubstantial under *Martinez*, and postconviction counsel could not have been ineffective for not pursuing it. This part of Claim 11 will be denied as procedurally defaulted.[11]

## XII. Ineffective Assistance for Failure to Investigate and Present Mental Health Testimony (Claim 12)

Petitioner argues in Claim 12 that trial counsel was ineffective for failing to adequately investigate, develop, and present mitigation testimony from a psychiatrist and his treating physicians. This claim is preserved. (Doc. 29 at 13-14, 62, 64; Doc. 95, Oral Arg. Tr. at 60-62; PCR Appellant's Br., Doc. 29-13 at 98-111.)

### A. Failure to Call a Psychiatrist

The state court rejected the failure-to-call-a-psychiatrist argument because: (1) counsel was not deficient for using a psychologist (Dr. Smith) instead; (2) the proposed psychiatric testimony from Dr. A. E. Daniel about substance abuse and depression was cumulative of Dr. Smith's testimony; (3) Dr. Daniel's testimony that Petitioner did not remember shooting the Bonnies would

---

[11] Claim 11 also purports to be an omnibus claim that incorporates the arguments in Claims 12 through 16. Some of Claims 12 through 16 are preserved, and some are not. As a result, the Court must apply different standards of review, and because it is unclear whether these claims can be properly analyzed together, the Court will treat each of these claims separately. However, even if the Court were to consider them all together under *Martinez*, they would be insubstantial for the same reasons discussed below.

have contradicted Dr. Smith's testimony; and (4) some parts of Dr. Daniel's testimony would have harmed the strategy of accepting responsibility. *Dorsey v. State*, 448 S.W.3d at 293-94.

This was a reasonable assessment of the evidence and application of *Strickland*. "Counsel's decision not to call particular witnesses during the penalty phase of trial . . . is presumed to be one of trial strategy unless clearly shown to be otherwise." *Winfield v. Roper*, 460 F.3d 1026, 1033 (8th Cir. 2006) (quotation marks and citations omitted). Here, there was no apparent reason to hire a psychiatrist over a psychologist. Petitioner had already been examined by a neuropsychologist, and the test revealed "no evidence of . . . a serious mental disease or defect of an organic defect." (Doc. 29-11, PCR Tr. at 600, 716.) Furthermore, the medical records available to trial counsel included psychiatric reports of depression, suicide attempts, and substance dependency, which Dr. Smith was capable of testifying about. (Doc. 29-11, PCR Tr. at 614-15; *e.g.*, PCR Ex. E at 3, 5, 18, 65, 72-76.)[12]

Dr. Daniel's testimony also would have been cumulative because his diagnoses were the same as Dr. Smith's. (Doc. 29-11, PCR Tr. at 39, 316-17.) It also was potentially damaging to the defense because Petitioner told Dr. Daniel he did not remember shooting the victims, but he told Dr. Smith he did remember shooting them. (*Id.* at 336-37; Doc. 29-6, Psychological Report of Dr. Smith at 17.) The State brought out during trial that Petitioner told Dr. Smith he remembered shooting the victims. (Trial Tr. at 961.) If Dr. Daniel had testified, the State could have emphasized the apparent contradiction between what he told the two doctors, which probably would have harmed the acceptance-of-responsibility strategy. (*See* Doc. 29-11, PCR Tr. at 316-17, 664-66, 734-35.) *See Winfield*, 460 F.3d at 1033 (counsel not ineffective for not calling witnesses who would damage the petitioner's case or whose testimony would be cumulative) (citation omitted); *Hall v. Luebbers*, 296 F.3d 685, 693 (8th Cir. 2002) (no prejudice for failure to introduce cumulative evidence). Therefore, it was reasonable for the state court to conclude that counsel was not ineffective for not calling Dr. Daniel.

## B. Failure to Call Treating Physicians

Petitioner argues that his two treating physicians, Dr. Girard Moline and Dr. John Lyskowski, could have shed light on Petitioner's substance dependency, depression, failed medical treatment, and suicide attempts. The state court held that trial counsel was not deficient for not

---

[12] The State submitted the PCR exhibits, including Exhibit E, to this Court by CD-ROM, rather than through the Court's Case Management/Electronic Case File system. (*See* Doc. 29 at 11 n.3.)

calling these witnesses because trial counsel presented essentially the same testimony through Dr. Smith and other witnesses. *Dorsey v. State*, 448 S.W.3d at 294-95. The trial transcript shows that Dr. Smith reviewed Petitioner's treatment records and testified about all these things at trial. Several other witnesses also illuminated Petitioner's struggles with substance dependency, depression, and suicide attempts. *See Winfield*, 460 F.3d at 1033 (counsel is not ineffective for not calling witnesses whose testimony would be cumulative).

Petitioner also argues that lay experts (such as treating physicians) are generally considered to be more credible than retained experts. He cites various secondary sources but provides no binding authority for the proposition that not calling a treating physician falls short of prevailing professional norms. *See Strickland*, 466 U.S. at 688-89 (The Court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance."). The state court's conclusion that counsel was not deficient on this point was reasonable. Therefore, Claim 12 will be denied on the merits.

## XIII. Ineffective Assistance for Failure to Investigate and Present Mitigation Testimony from Additional Family Members (Claim 13)

In Claim 13, Petitioner argues that trial counsel should have investigated and presented testimony from 11 additional family members who wrote letters to the trial judge after trial but before the pronouncement of sentence. The letters stated (1) that they love Petitioner and do not want him to be executed; (2) that executing him will do affirmative harm to the family; (3) and that Sarah Bonnie would not have wanted him to be executed. (Doc. 29-4 at 2-22.) This claim is procedurally defaulted. (Doc. 25 at 303.) Petitioner seeks to invoke *Martinez* to excuse the default, but Claim 13 is insubstantial under *Martinez* for lack of prejudice.[13]

In assessing prejudice, the Court "reweigh[s] the evidence in aggravation against the totality of available mitigating evidence" to determine whether there is a reasonable probability that the jury would have assessed a life sentence if it had heard the additional mitigation evidence. *Wiggins*, 539 U.S. at 534. Here, three of the 11 family members who wrote letters to the trial judge also testified at trial. (Doc. 29-4 at 9, 13, 18; Trial Tr. at v-vi.) Specifically, Petitioner's mother (Patty Dorsey) and two cousins (Pam Brauner and Jenni Smith) testified about Petitioner's lovability, good nature, good deeds, struggles with addiction and depression, and capacity for remorse. Petitioner's father (Larry Dorsey) testified similarly and added Petitioner's passion for

---

[13] The State's brief does not address the deficiency prong. (Doc. 29 at 155-57.)

sports and a lack of meanness or violence. Additional mitigation evidence included psychological testimony from Dr. Smith; testimony from a former sports teammate and roommate (Rudy York); testimony from two coaches (Ron Cole and Roger Brown) about Petitioner's even temper, hard work, likability, and capacity to function in society as a barber; and testimony from another cousin (Adam Horn), who stated that Petitioner was close with the family, loved by all the kids, and never aggressive. In aggravation, the prosecution called the parents and siblings of both victims and focused its case on the brutal nature of the murders, the monetary motive, and the rape.

Considering the strength of the aggravation evidence and the mitigation evidence that was adduced at trial, there is not a reasonable probability that the similar additional evidence proffered in Claim 13 would have led the jury to assess a life sentence. Unlike the cases cited by Petitioner, *Rompilla v. Beard*, 545 U.S. 374, 393 (2005) and *Marquez-Burrola v. State*, 157 P.3d 749, 754, 763-69 (Okla. 2007) (*see* Doc. 94), Petitioner's mitigation defense did not lack a "real, coherent mitigation strategy" or consist only of testimony from the defendant's immediate family in "less than fifteen pages of the transcript." In this case, trial counsel put on ten mitigation witnesses (including Petitioner himself) who gave specific, objective examples of why he has value as a human being. This went beyond the "few naked pleas for mercy" that were rejected as inadequate in *Rompilla* and *Marquez-Burrola*.

Petitioner also argues that not presenting these witnesses allowed the jury to speculate that other members of the family must have wanted the death penalty. However, he fails to explain why the jury must have assumed other family members wanted the death penalty instead of a life sentence. Several of the mutual family members of both Petitioner and the victims testified for the defense, while others testified for the prosecution. Furthermore, the jury was instructed not to consider evidence outside the record, which would include any speculation about other family members' wishes. (Doc. 29-3 at 176.) The Court presumes the jury followed this instruction. *Gee v. Groose*, 110 F.3d 1346, 1349 (8th Cir. 1997).

Therefore, this claim is insubstantial under *Martinez*, and postconviction counsel could not have been ineffective for not pursuing it. Claim 13 will be denied as procedurally defaulted.

## XIV. Ineffective Assistance for Failure to Investigate and Present Evidence of Head Trauma (Claim 14)

In Claim 14, Petitioner argues that trial counsel failed to investigate, develop, and present mitigation evidence of his history of head trauma and "possible" brain impairment. This claim is

procedurally defaulted. (Doc. 25 at 312; Doc. 95, Oral Arg. Tr. at 60-62.) Petitioner seeks to invoke *Martinez* to excuse the default, but Claim 14 is insubstantial under *Martinez*.

This claim fails under both prongs of *Strickland*. At the postconviction hearing, trial counsel testified that the neuropsychologist they hired "didn't see any organic issues" or any "evidence of . . . a serious mental disease or defect of an organic defect." (Doc. 29-11, PCR Tr. at 583, 600-01, 650-52, 716.) According to Mr. Slusher, the neuropsychologist did not provide any useful information for the defense, and after reviewing Petitioner's background, Mr. Slusher did not believe further testing was warranted (other than psychological exams) because there was no evidence that Petitioner had a "severe" mental illness, such as schizophrenia. (*Id.* at 643, 652.) Given the lack of any apparent brain damage, counsel's decision not to investigate further for mitigating evidence of head trauma or brain impairment was reasonable. *See Anderson v. Kelley*, ___ F.3d ___, 2019 WL 4280360 at *5 (8th Cir. Sept. 11, 2019) (finding no deficiency where "no expert concluded that [the petitioner] had brain damage" and there were no "red flags pointing up a need to test further") (quotation marks and citation omitted); *Johnston v. Luebbers*, 288 F.3d 1048, 1060 (8th Cir. 2002) (a report of "no evidence of gross brain damage" supported trial counsel's decision not to present similar evidence); *Kemp*, 924 F.3d at 500 ("When counsel makes strategic choices after a thorough investigation of law and facts, those decisions are 'virtually unchallengeable.'") (quoting *Strickland*, 466 U.S. at 690).

For similar reasons, there is also no prejudice. Petitioner points to evidence in his medical history that suggests he could have had a brain impairment, including head injuries from a hard fall on the sidewalk as a small child, a bicycle wreck that required stitches, an ATV accident, a car accident, and repeated jolts to the head when playing sports. Petitioner argues that these incidents could have led to emotional disturbances and mental deterioration over time and that trial counsel could have used it to explain Petitioner's mental condition at the time of the crime. However, Petitioner fails to explain how these events throughout his history could have affected his mental condition at the time of the offense when there is no medical evidence that they caused brain damage. Petitioner testified coherently on his own behalf during trial, and Dr. Daniel indicated during the postconviction hearing that Petitioner "doesn't suffer from any intelligence deficits." (Doc. 29-11, PCR Tr. at 322.) Accordingly, there is not a reasonable probability that investigating and presenting evidence of head trauma and "possible" brain impairment would have produced a life sentence.

Therefore, this claim is insubstantial under *Martinez*, and postconviction counsel could not have been ineffective for not pursuing it. Claim 14 will be denied as procedurally defaulted.

## XV. Ineffective Assistance for Failure to Investigate and Present Mitigation Evidence of the Great Flood of 1993 (Claim 15)

In Claim 15, Petitioner argues that trial counsel was ineffective for failing to investigate and present evidence that the Great Flood of 1993 affected Petitioner's mental health because toxins in the water might have affected him and because the flood destroyed the town of Cedar City, Missouri, which was his childhood refuge. This claim is procedurally defaulted. (Doc. 25 at 323; Doc. 95, Oral Arg. Tr. at 60-62.) Petitioner seeks to invoke *Martinez* to excuse the default, but Claim 15 is insubstantial under *Martinez*.

This claim fails under both prongs of *Strickland*. Without some indication that the floodwater caused a medical condition, counsel was not deficient for not investigating this issue. Unlike the case cited by Petitioner, *Caro v. Woodford*, 280 F.3d 1247 (9th Cir. 2002), there is no evidence of brain damage here. Furthermore, the potential for psychological damage was not such a compelling investigative lead that any competent lawyer would have pursued it. *Strickland*, 466 U.S. at 689; *see also Knowles v. Mirzayance*, 556 U.S. 111, 127 (2009) ("The law does not require counsel to raise every available nonfrivolous defense.").

There is also no prejudice. As already mentioned, there is no medical evidence of brain damage. Furthermore, it is apparent that Petitioner's substance abuse issues and depression began prior to the 1993 flood. (Trial Tr. at 939-40; Doc. 29-11, PCR Tr. at 59-60, 64.) Moreover, the proffered flood-related evidence would have added little if any mitigating value, given that trial counsel's focus on Petitioner's substance abuse and depression was unsuccessful. Accordingly, there is not a reasonable probability that presenting this evidence at trial would have produced a life sentence.

Therefore, this claim is insubstantial under *Martinez*, and postconviction counsel could not have been ineffective for not pursuing it. Claim 15 will be denied as procedurally defaulted.

## XVI. Ineffective Assistance for Failure to Investigate and Present Mitigation Evidence of Good Behavior While in Custody (Claim 16)

In Claim 16, Petitioner argues that trial counsel was ineffective for not investigating and presenting evidence that he has adjusted well to life in prison and has a history of good behavior and employment while in custody. This claim is procedurally defaulted. (Doc. 25 at 332;

Doc. 95, Oral Arg. Tr. at 60-62.) Petitioner seeks to invoke *Martinez* to excuse the default, but Claim 15 is insubstantial under *Martinez*.

This claim fails under both prongs of *Strickland*. Trial counsel was not deficient for choosing to focus their efforts elsewhere to support the mitigation case. "*Strickland* does not require counsel to investigate every conceivable line of mitigating evidence no matter how unlikely the effort would be to assist the defendant at sentencing." *Wiggins*, 539 U.S. at 533. The case cited by Petitioner, *Skipper v. South Carolina*, 476 U.S. 1 (1986) is distinguishable. *Skipper* held that this type of evidence was *admissible*, not that counsel was ineffective for not introducing it. Here, Petitioner's family testified that he was a good person who had a positive impact on peoples' lives and that his misconduct was largely attributable to substance abuse. Although this evidence is not exactly the same type as the evidence proffered here, it was reasonable for trial counsel to focus on Petitioner's good character outside of custody rather than on his good behavior and ability to adjust to incarceration without violence. *Cf. Cole v. Roper*, 623 F.3d 1183, 1190 (8th Cir. 2010) (no deficiency on a similar claim under § 2254 deference).

There is also no prejudice. Given the mitigation evidence that was adduced of Petitioner's good character and the strength of the prosecution's aggravation case, there is not a reasonable probability that additional mitigation evidence of good behavior and an ability to adjust to prison life without violence would have led the jury to assess a life sentence. *Cf. Skillicorn v. Luebbers*, 475 F.3d 965, 975 (8th Cir. 2007) (no prejudice on a similar claim under § 2254 deference).

Therefore, this claim is insubstantial under *Martinez*, and postconviction counsel could not have been ineffective for not pursuing it. Claim 16 will be denied as procedurally defaulted.

## XVII.    Ineffective Assistance for Statements During Voir Dire (Claim 17)

In Claim 17, Petitioner argues that trial counsel was ineffective for "erroneously asserting to potential jurors during voir dire that life imprisonment costs more than the death penalty." (Doc. 25 at 332.) This claim is procedurally defaulted. (Doc. 25 at 336; Doc. 95, Oral Arg. Tr. at 84-85.) Petitioner seeks to invoke *Martinez* to excuse the default, but Claim 15 is insubstantial under *Martinez* because trial counsel was not deficient with respect to this claim.

Contrary to Petitioner's assertion, trial counsel did not tell prospective jurors that life imprisonment costs more than the death penalty. Mr. Slusher stated as follows:

> MR. SLUSHER: Okay. Well, let me ask you about the other option. And I can ask this as a group also. Life without parole in the State of Missouri means exactly that. Sometimes we hear people express the opinion that they're bothered

by the costs of society paying to put people in prison. Is that something that concerns you --

> MR. SLUSHER: --about that punishment?

> VENIREMAN VAUGHT: No, sir.

> MR. SLUSHER: --about that punishment?

> VENIREMAN VAUGHT: Not one bit.

> MR. SLUSHER: Does anyone else on the panel have a concern, or is that a view they've expressed before, about we're having to pay all of this money to keep people in prison?

> VENIREMAN BORMANN: Yeah. I can honestly say I have, because, as a county employee at one time, you know, everything is that way, you know.

> MR. SLUSHER: And you worked in the jail at one time?

> VENIREMAN BORMANN: Yeah.

> . . . .

(Trial Tr. at 431-32.) Trial counsel used a peremptory strike to remove Venireperson Bormann.

(Doc. 29-3 at 169.) Mr. Slusher also stated as follows:

> MR. SLUSHER: You know, I think we've sometimes heard people express the opinion that, you know, they're worried about paying for people to live in prison, that we, as a society, have to pay for that. Is that something that you've ever had a concern about?

> VENIREMAN KRICK: No.

> MR. SLUSHER: Ms. Tarleton, I'll ask you the same thing. With respect to life without parole, have you ever held the opinion that we have to pay too much as a society to keep people in prison?

> VENIREMAN TARLETON: I probably have considered that, but I wouldn't let if [sic] affect my situation.

> MR. SLUSHER: You need to keep your voice up just a little bit.

> VENIREMAN TARLETON: I will consider that fact, but it would not affect the decision.

(Trial Tr. at 489-90.) Venireperson Tarleton was a juror. (*Id.* at 262, 1046.)

It is apparent from this portion of the transcript that Mr. Slusher did not convey the message that life imprisonment costs more than the death penalty. Rather, Mr. Slusher asked whether anyone held an opinion that the cost of imprisonment is relevant in an apparent attempt to avoid seating a biased or unfavorable juror. Trial counsel removed Venireperson Bormann, who

unequivocally gave an unfavorable response, but not Venireperson Tarleton, who said without prompting that she would not let this affect her decision. This was reasonable.

Petitioner also argues that trial counsel should have cleared up that the death penalty actually costs more than life imprisonment. This type of statement would have been argumentative, which is improper during voir dire. *State v. Clark*, 981 S.W.2d 143, 146 (Mo. banc 1998). This statement also would have been improper for the same reason prosecutors cannot say in closing argument that the cost of imprisonment may justify the death penalty— because it is irrelevant to the circumstances of the crime and the characteristics of the defendant. *See Antwine v. Delo*, 54 F.3d 1357, 1364 (8th Cir. 1995), and *Blair v. Armontrout*, 916 F.2d 1310, 1323 (8th Cir. 1990). Trial counsel was not deficient for how they handled this issue during voir dire. Therefore, this claim is insubstantial under *Martinez*, and postconviction counsel could not have been ineffective for not pursuing it. Claim 17 will be denied as procedurally defaulted.

## XVIII.      Ineffective Assistance for Failure to Strike Juror Ryan Reddick (Claim 18)

In Claim 18, Petitioner argues that trial counsel should have moved to strike juror Ryan Reddick when he disclosed during trial that he was previously Ben Bonnie's supervisor. This claim is preserved. (Doc. 29 at 13, 65.)

### A.      Unreasonable Application of *Strickland* (§ 2254(d)(1))

The state court held that trial counsel was not deficient because Petitioner failed to show Mr. Reddick was biased and because "[i]t was reasonable for counsel to keep Mr. Reddick on the jury when he gave favorable answers in voir dire and testified that his prior relationship with Ben would not influence his decision." *Dorsey v. State*, 448 S.W.3d at 299. This was a reasonable application of *Strickland*.

Mr. Reddick informed the trial court during the first break during trial that he might have worked with Ben Bonnie. (Trial Tr. at 572.) Mr. Reddick apologized when he took the stand and said, "I missed that. I did not have any clue about that." (*Id.* at 573.) In response to questioning by the trial judge and trial counsel, he testified that he worked closely with Ben as his supervisor at a muffler shop for approximately six months and felt like Ben did really good work. (*Id.* at 573-75.) However, Mr. Reddick also testified that he did not socialize with Ben outside of work, that this prior relationship would not make any difference to him, and that it would not influence his decision. (*Id.* at 573.) Trial counsel then discussed the matter off the record and ultimately requested no action from the trial judge. (*Id.* at 575.)

At the postconviction hearing, neither of Petitioner's trial lawyers could remember the exact reason for this decision. Mr. Slusher testified that, typically, they would have looked at the voir dire of the alternate juror to see if he or she was more favorable. (Doc. 29-11, PCR Tr. at 636-37.) Mr. McBride testified that he thought he and Mr. Slusher "liked what Mr. Reddick had said earlier on voir dire." (*Id.* at 723.) Neither lawyer discussed specific voir dire inquiries during the postconviction hearing.

During voir dire, Mr. Reddick stated that his brother was in and out of custody because of a drug addiction; that he was sometimes close with his brother; that he had family members with mental issues and/or bipolar disorder; and that he was not strongly in favor of the death penalty. (Trial Tr. at 272, 325, 424.) The first alternate, Venireperson Weable (*Id.* at 172, 283, 1029), seemed to have rapport with the prosecutor because, without prompting, he repeated the prosecutor's earlier quip that the prosecutor was increasing his "average" in pronouncing names correctly (*id.* at 452). The second alternate, Venireperson Oehrle (*id.* at 172, 283, 1029), stated that he was strongly in favor of the death penalty (*id.* at 476). Based on this testimony, it was reasonable to consider Mr. Reddick to be the more defense-friendly juror, as compared to the first two alternates. Accordingly, the state court reasonably concluded counsel was not deficient.

## B.     Unreasonable Factual Determination (§ 2254(d)(2))

Petitioner also argues that the state court incorrectly determined the facts by stating that Mr. Reddick recognized Ben from a picture, when in fact, no picture of Ben had been presented at trial yet. The Supreme Court of Missouri stated as follows in support of its decision: "Mr. Reddick did not even remember Ben by name; he thought he may have worked with him only after seeing Ben's picture. Even then, he did not state definitively that he worked with Ben until someone confirmed that Ben worked at Custom Muffler." *Dorsey v. State*, 448 S.W.3d at 299.

The State concedes that the state court made a factual error. No picture of Ben was presented at trial until after Mr. Reddick raised this issue to the trial judge.[14] (Trial Tr. at viii-x, 595.) However, this was not an "unreasonable determination of facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). Postconviction counsel stated in his amended postconviction motion, and adduced testimony from trial counsel,

---

[14] The State asserts that Mr. Reddick probably remembered Ben because a witness mentioned that he worked as a mechanic in Jefferson City. (Trial Tr. at 539.) The actual reason is unknown because no one asked Mr. Reddick on the record what jogged his memory.

that Mr. Reddick recognized Ben from a picture.  (Doc. 29-12, Amended PCR Motion at 92; Doc. 29-11, PCR Tr. at 722.)  Appellate postconviction counsel repeated this error on appeal, and this was not a contested issue in the postconviction proceedings.  (Doc. 29-13, PCR Appellant's Br. at 125.)  As a result, the state court's mistake of fact was reasonable.

Even if § 2254(d)(2) were satisfied, this would not end the inquiry.  Petitioner's claim must still have merit regardless of the state court's factual error.  *See Horn v. Banks*, 536 U.S. 266, 272 (2002) ("[N]one of our post-AEDPA cases have suggested that a writ of habeas corpus should automatically issue if a prisoner satisfies the AEDPA standard . . . ."); *Rice v. White*, 660 F.3d 242, 257 (6th Cir. 2011) ("It is not enough that Petitioner show an unreasonable determination of fact under § 2254(d)(2)—doing so only removes AEDPA's litigation bar.  Once the bar is removed, Petitioner must show that he is being held in violation of federal law by identifying, and prevailing on, a federal claim."); Brian R. Means, Postconviction Remedies § 29.45 at 385-86 & nn.16-17 (2017).  Here, based on the voir dire testimony discussed above, competent counsel could have decided that Mr. Reddick's voir dire answers were more favorable than either alternate juror.  Accordingly, trial counsel was not deficient for deciding to leave him on the jury.

Therefore, Claim 18 will be denied on the merits.

## XIX.    Ineffective Assistance for Failure to Strike Juror Christian Carson (Claim 19)

In Claim 19, Petitioner argues that trial counsel was ineffective for not using a peremptory strike on Juror Christian Carson because he worked as a geneticist in a paternity laboratory and was acquainted with the prosecutor and two of the State's expert witnesses.  This claim is procedurally defaulted.  (Doc. 25 at 344; Doc. 95, Oral Arg. Tr. at 85-86.)  Petitioner seeks to invoke *Martinez* to excuse the default, but Claim 19 is insubstantial under *Martinez* because he has not pleaded facts to rebut the presumption that counsel made competent strategic decisions in exercising peremptory strikes.

Following voir dire, trial counsel moved to strike Mr. Carson for cause based on his background as a geneticist.  (Trial Tr. at 334-35.)  The trial judge overruled the objection.  (*Id.* at 335.)  Petitioner now argues trial counsel should have used one of their nine peremptory strikes on him.  However, trial counsel did not contest the prosecution's DNA evidence at trial, so the effect of Mr. Carson commenting on the DNA evidence[15] would have been minimal.

---

[15] Petitioner has filed an affidavit from Mr. Carson that states as follows: "The jury had some questions about the DNA.  I figured that they put me on this jury, so it was ok for me to answer the questions

Furthermore, Mr. Carson did not have a close relationship with the prosecutor or the two experts, and he was not strongly in favor of the death penalty, unlike four of the venire members trial counsel used peremptory strikes on. (Doc. 29-3 at 168-71; Trial Tr. at 124, 221, 301-02, 372, 380, 413, 421, 426.) Petitioner does not say which one should have been kept instead of Mr. Carson, and any of them could have seemed more prosecution friendly than Mr. Carson. For example, of the five who were not strongly in favor of the death penalty, Venireperson Bormann said she was concerned about the cost of life without parole, and she previously worked in law enforcement (*id.* at 230, 432); Venireperson Leiby said he couldn't see mitigating evidence of drugs or alcohol as an excuse (*id.* at 420); Venireperson Alicea remembered hearing about the case through the media (*id.* at 143); and any of them could have given off negative signals not apparent from a cold transcript, such as demeanor, inflection, tone, hesitation, or general rapport.

Petitioner has failed to plead facts showing that there was no reasonable strategy behind trial counsel's peremptory strikes. *See Strickland*, 466 U.S. at 688-89 (The Court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance."); *Wright v. United States*, No. 03-3135-01-CR-S-RED, 2009 WL 1025584, at *3 (W.D. Mo. Apr. 15, 2009) ("Counsel's decision not to use a peremptory strike . . . was a strategy decision," so it was "virtually unchallengeable.") (quotation marks and citation omitted). Therefore, this claim is insubstantial under *Martinez*, and postconviction counsel could not have been ineffective for not pursuing it. Claim 19 will be denied as procedurally defaulted.

## XX. Prosecutorial Misconduct and Ineffective Assistance Regarding John Sim and Patricia Cannella (Claim 20)

In Claim 20, Petitioner argues that the prosecutor committed misconduct (1) by falsely implying that John Sim, who was the only other Y-chromosome CODIS hit discussed at trial, was incarcerated at all relevant times; and (2) by failing to correct Patricia Cannella's false testimony. Petitioner did not raise a prosecutorial misconduct claim on this basis in state court, so this claim appears to be procedurally defaulted. *Interiano*, 471 F.3d at 856 ("[A] federal habeas petitioner's claims must rely on the same factual and legal bases relied on in state court."). However, the parties agree that the first part of this claim, Claim 20(A), is "partially" preserved as an

---

since they left me on here." (Pet. App. at 5469.) This affidavit is inadmissible to impeach the verdict, *see* Fed. R. Evid. 606(b)(1); *Warger*, 135 S. Ct. at 527, and the Court presumes the jurors followed the trial court's instruction that their "decision must be based only on the evidence presented . . . in the proceedings in th[e] courtroom" (Doc. 29-3 at 176); *Gee*, 110 F.3d at 1349.

ineffectiveness claim that was addressed by the state court. (Doc. 29 at 59; Doc. 95, Oral Arg. Tr. at 93, 98) Accordingly, this Court will construe Claim 20(A) as an ineffectiveness claim and analyze it under § 2254.[16]

### A. Prosecutorial Misconduct and Ineffective Assistance Regarding John Sim (Claim 20(A))

During trial, the prosecutor had the following exchange with the State's DNA expert:

Q. Mr. Sims [sic] was, at that time and at the relevant times in this case, in prison, was he not?

A. I don't have that information.

Q. But that's where that was developed from, if Mr. Sims [sic] was -- the Sims [sic] sample was coded when he entered the Department of Corrections; correct? Isn't that the database it came from?

A. Yes.

(Trial Tr. at 849.)

The state court held that, regardless of whether counsel was deficient for not investigating Mr. Sim's whereabouts at the time of the offense, there was no prejudice because (1) Mr. Sim's whereabouts were irrelevant, given the defense strategy of accepting responsibility rather than contesting the rape; (2) the witness did not know Mr. Sim's whereabouts; and (3) the jury was instructed not to consider the lawyers' questions as evidence. *Dorsey v. State*, 448 S.W.3d at 289.

The Court acknowledges that the rape was a critical part of the State's aggravation case and that, according to Mr. Slusher's testimony, the defense would have contested the rape if there was an effective way to do so. (Doc. 29-11, PCR Tr. at 665.) Furthermore, although the jury is presumed to follow the instruction that questions are not evidence (Doc. 29-3 at 177); *Gee v. Groose*, 110 F.3d 1346, 1349 (8th Cir. 1997), the witness answered "Yes" when the prosecutor asked whether Mr. Sim's DNA was in CODIS because he entered the Department of Corrections at some point. Without correction or additional guidance, the jury could have inferred that this meant he was still in custody at the time of the offense.

---

[16] As pled, Claim 20(A) is a standalone prosecutorial misconduct claim (i.e., one with no accompanying ineffectiveness argument for failure to investigate and object to the misconduct). Due to the State's concession, the Court will analyze this as a preserved ineffectiveness claim. To the extent the Court must also address the standalone prosecutorial misconduct aspect of this claim, it remains procedurally defaulted because Petitioner does not attempt to invoke *Martinez* or any other reason to excuse the default. (*See* Doc. 25 at 344-52; Doc. 86 at 42-46; Doc. 95, Oral Arg. Tr. at 90-99.)

Notwithstanding, the Court finds the state court's reasoning to be a reasonable application of *Strickland*'s prejudice prong. The fact that Mr. Sim was not in custody at the time of the offense would not have mattered because Petitioner has not connected Mr. Sim to the offense. He has connected Mr. Sim only to Missouri in a general nature and to his ownership of a pickup truck. (Doc. 86 at 27, 43); *see State v. Chaney*, 967 S.W.2d 47, 55 (Mo. banc 1998) (evidence of third-party motive or opportunity inadmissible unless there is an act directly connecting the third party to the crime). Even assuming the prosecutor still would have made these comments after the defense investigated this issue and produced its findings through discovery, it is highly unlikely that pointing the finger at Mr. Sim instead of accepting responsibility would have been successful. Accordingly, the state court reasonably concluded that there was not a reasonable probability of a different result.

### B.   Prosecutorial Misconduct and Ineffective Assistance Regarding Patricia Cannella (Claim 20(B))

In Claim 20(B), Petitioner argues that the prosecutor committed misconduct under *Giglio v. United States*, 405 U.S. 150 (1972) and *Napue v. Illinois*, 360 U.S. 264 (1959) by eliciting perjured testimony from Ms. Cannella that she did not try to collect on Petitioner's drug debt. Petitioner asserts two separate reasons to excuse the default.

First, Petitioner argues that the State improperly withheld *Brady* evidence about Cannella until it was too late to raise this prosecutorial misconduct claim. (Doc. 86 at 44 (citing *Banks v. Dretke*, 540 U.S. 668, 691 (2004).) However, Petitioner fails to say what evidence was withheld that would have supported this claim. This is insufficient to show cause and prejudice. All the evidence cited in Claim 20(B) of the Petition appears to have been available to trial counsel in police reports they obtained from the public defender's office, and none of the *Brady* evidence at issue in Claim 9 related to Cannella is relevant to whether she was trying to collect the debt. (Doc. 29-11, PCR Tr. at 584; Pet. App. at 1-627 (discovery file available to counsel); Pet. App. at 4660-4995 (Claim 9 evidence of criminal background and favorable treatment by the prosecution)).

Second, at oral argument, Petitioner recharacterized this prosecutorial misconduct claim as an ineffective-assistance-of-trial-counsel claim and invoked *Martinez*. (Doc. 95, Oral Arg. Tr. at 93-94, 99.) Looking past the fact that this is an improper way of amending the Petition, this reformulated ineffectiveness claim is insubstantial under *Martinez*. For Petitioner to prevail, trial

counsel must show that the State "used perjured testimony," among other things. *United States v. Jordan*, 150 F.3d 895, 900 (8th Cir. 1998). Cannella's testimony was not perjured. Unlike in *Giglio* and *Napue*, this is not a case where the witness lied under oath about receiving a promise of leniency from the government, which was objectively false and known by the prosecution to be false. Cannella testified that she loaned Petitioner money for drugs but did not try to "collect" the debt. (Trial Tr. at 605.) Other testimony in the record suggests Cannella was at Petitioner's home because of the drug debt and that he needed help removing her from the premises. (*Id.* at 581, 597, 888-89.) However, Cannella's own characterization of her actions as not trying to "collect" the debt was an opinion, not a falsifiable statement of fact that the prosecutor had a duty to correct.

Even if the Court were to go a step further and construe Cannella's statement as perjured, the State did not use it or fail to correct it. To the contrary, the prosecutor suggested in closing argument that Ms. Cannella's characterization was inaccurate because she "was at his apartment and wasn't letting him go until he came up with" the money. (*Id.* at 1001.) Petitioner himself testified that he needed help removing Cannella from his apartment (*id.* at 888-89), and the State put on two witnesses who corroborated this series of events and two other witnesses who testified that Petitioner showed up at Cannella's home the next morning trying to sell property later identified as the Bonnies'. (*Id.* at 581, 596-97, 617-20, 627-34.) Because the State did not use or fail to correct Cannella's statement, trial counsel was not deficient for not objecting based on prosecutorial misconduct.

There is also not a reasonable probability that the jury would have assessed a life sentence if trial counsel had successfully impeached Cannella on this issue.[17] It was abundantly clear she was putting pressure on Petitioner to pay his drug debt, despite her protest. To the extent any jurors might have believed her, impeachment would not have had much effect, given that the rest of her testimony was cumulative of other witnesses, as discussed with respect to Claim 9. Therefore, Claim 20 is insubstantial under *Martinez*, and postconviction counsel could not have been ineffective for not pursuing it. Claim 20 will be denied as procedurally defaulted.

---

[17] Although the materiality standard for a perjured testimony claim is different and less onerous than *Strickland* prejudice, Petitioner must meet the *Strickland* prejudice standard to satisfy *Martinez* and to succeed on a habeas claim generally. *See United States v. Clay*, 720 F.3d 1021, 1026 n.4 (8th Cir. 2013).

**XXI.** **Ineffective Assistance for Failure to Cross-Examine Witnesses and Investigate Crime Scene Evidence (Claims 21 and 1(A)(3))**

In Claim 21, Petitioner argues that trial counsel was ineffective for failing to cross-examine the State's DNA expert (Jason Wyckoff) about the Y-chromosome evidence and for failing to cross-examine the crime scene investigator (Detective Jeff Nichols) about his testimony that Defendant poured bleach on Sarah Bonnie. In Claim 1(A)(3), Petitioner argues that trial counsel failed to investigate various crime scene issues.

### A. Failure to Cross Examine Witnesses (Claim 21)

The parties' briefs and arguments are unclear about whether they believe this claim is preserved. The Petition concedes default. (Doc. 25 at 362.) The State's response concedes preservation of the bleach part of this claim but not the Y-chromosome part, without explaining why one part is defaulted but not the other. (Doc. 29 at 61-62, 65.) Petitioner's Traverse then backtracks and argues that the whole claim was preserved. (Doc. 86 at 43.) At oral argument, the State seemed to concede that all of Petitioner's claims relating to the bleach and Y-chromosome issues are preserved. (Oral Arg. Tr., Doc. 95 at 28-29, 37, 46-47, 59-60.)

Upon review of the record, it is apparent that Petitioner raised similar ineffectiveness claims in state court but not claims of failure to cross-examine. *See Dorsey v. State*, 448 S.W.3d at 286-88, 296-98 (addressing ineffectiveness claims for failure to counter the bleach evidence and failure to challenge the Y-chromosome evidence). Due to the State's apparent concession at oral argument, and because Claim 21 appears to be similar enough to the claims raised in state court, this Court will review Claim 21 on the merits. *See Ward v. Norris*, 577 F.3d 925, 935 (8th Cir. 2009) (The Court may review "closely related claims containing an arguable factual commonality."). *Cf. Dansby v. Hobbs*, 766 F.3d 809, 824 (8th Cir. 2014) (The Court may not raise a procedural default *sua sponte* without providing adequate notice and an opportunity to be heard).

### 1. Failure to Cross-Examine and Impeach Jason Wyckoff Regarding Y-Chromosome Evidence (Claim 21(A))

The Court has already rejected Petitioner's arguments that trial counsel was ineffective for not investigating the Y-chromosome evidence in Claims 6 and 1(A)(4). This claim fails for essentially the same reason: he cannot discredit the Y-chromosome evidence based on the allegations in the Petition. Therefore, there is not a reasonable probability that cross-examining Mr. Wyckoff on this basis would have led the jury to assess a life sentence.

## 2. Failure to Cross-Examine and Impeach Detective Nichols Regarding Bleach Evidence (Claim 21(B))

At trial, Detective Nichols testified that he noticed a strong smell of bleach in the bedroom around where he found Sarah Bonnie's body.  (Trial Tr. at 672-73.)  He saw a bleach bottle in the bedroom sink and a discolored or bleached-out spot on the carpet next to Sarah Bonnie's side of the bed.  (*Id.* at 673-75.)  According to Traci Sheley, who was at the Bonnies' house on the day of the murders, the bleach bottle was not there when she left.  (*Id.* at 585.)  Detective Nichols also observed, using an alternative light source, what appeared to be a pour pattern running through the dried blood on Sarah Bonnie's mid-section and groin area.  (*Id.* at 676, 679, 685-87.)  He then took a swab from the pour pattern and cut out a portion of the carpet for testing, but he never heard back on the test results.  (*Id.* at 673-74, 687.)  Mr. Wyckoff, the DNA expert, also testified that the initial test of the vaginal swabs for semen came back negative despite the presence of sperm cells and the test could have been affected by the use of a "chemical insult," such as a cleanser.  (*Id.* at 840-41.)  Trial counsel did not attempt to challenge the bleach issue during trial.

In the postconviction proceedings, Petitioner argued that trial counsel was ineffective for not demonstrating that the pour pattern could have been beer rather than bleach.  The Supreme Court of Missouri held that it was reasonable not to investigate and counter the bleach evidence because (1) there was evidence of bleach in the bedroom and DNA evidence matching Petitioner; (2) the pattern went through the dried blood, so it was apparent the pour or spill happened after Sarah Bonnie was shot; and (3) trial counsel could not have effectively countered the rape by introducing evidence that the substance might have been beer rather than bleach.  *Dorsey v. State*, 448 S.W.3d at 298.  This was a reasonable application of *Strickland*'s deficiency prong.

Petitioner argues that trial counsel should have used lab reports and testimony from other officers who said they did not smell bleach in the bedroom to cross-examine and impeach Detective Nichols.  (Doc. 25 at 359; Pet. App. at 5057, 5103.)  According to the relevant lab reports, the carpet sample and swab were not tested for bleach "[d]ue to the evaporative nature of bleach."  (Pet. App. at 3553-54.)  The carpet sample had "apparent color bleached areas" with a "slight but unknown odor . . . not recognized as bleach."  (*Id.* at 3553.)  The swab had no odor.  (*Id.* at 3554.)  This does not show that the substance poured on Sarah Bonnie was something other than bleach.  There was ample evidence that it was bleach, as discussed above.  Even if it wasn't, however, the pour marks through the dried blood still suggest Petitioner poured something on her

body after she was killed. Accordingly, the state court reasonably concluded that counsel was not deficient for failing to contest this issue. *See Strickland*, 466 U.S. at 689 ("[T]he defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy.") (quotation marks and citation omitted); *Harrington*, 562 U.S. at 105 ("The standards created by *Strickland* and § 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so."). Therefore, Claim 21 will be denied on the merits.

**B.      Failure to Investigate Crime Scene Evidence (Claim 1(A)(3))**

In Claim 1(A)(3), Petitioner argues that trial counsel failed to investigate (1) whether the substance poured on Sarah Bonnie's body was bleach, (2) unexplained blood spatter in the Bonnies' house, and (3) evidence of crime scene contamination. The bleach part of this claim will be treated as preserved and denied on the merits for the same reasons just discussed in Claim 21(B).

The blood spatter and contamination issues are procedurally defaulted (Doc. 95, Oral Arg. Tr. at 28-29) and insubstantial under *Martinez*. Petitioner alleges that Sarah Bonnie's father went into the house without protective clothing, popped the lock on the victims' bedroom door, moved the blanket that covered Sarah Bonnie, and touched the victims' bodies to see if they were alive. Several police officers also went into the house without protective clothing and kicked open the other bedroom door. There were dogs in the house, and they apparently tracked blood through the house after the doors to the bedroom were opened. Police reports described blood spatter consistent with Ben Bonnie's DNA in various parts of the living room, including behind a closed glass door. Petitioner claims this "refute[s] the State's theory that all of the violence surrounding the murders occurred in the bedroom" and should have prompted trial counsel to advise Petitioner to insist on a guilt-phase trial. (Doc. 25 at 157.)

Trial counsel was not deficient for not investigating these issues. Petitioner fails to explain why counsel should have believed that this investigation could have produced exculpatory evidence. Nothing in the police reports about the initial entries into the home suggests the vaginal swabs were contaminated. Moreover, this investigation could not have removed the evidence that Petitioner was not ruled out as a contributor to the Y-chromosome profile found on the vaginal swabs; the various witnesses who told police they saw Petitioner the day after the murders with Sarah Bonnie's car trying to sell the victims' property; the fact that he turned himself in to police with Sarah Bonnie's social security card in his back pocket; or his statement to police that he was

"the right man concerning the death of the Bonnies." Given the wealth of guilt evidence available to trial counsel, they were not deficient in advising him to plead guilty and pursue a strategy of accepting responsibility without conducting an additional investigation into the crime scene.

There is also no prejudice. Petitioner provides only his own speculative belief that further investigation into the crime scene could have uncovered *something*, without saying what he would have been able to show. The fact that there are "questions about the crime scene which remain unexplained" is insufficient to show a reasonable probability that Petitioner would have insisted on a guilt-phase trial with further investigation. (Doc. 95, Oral Arg. Tr. at 30-31.) Therefore, the contamination and blood spatter parts of Claim 1(A)(3) are insubstantial under *Martinez*, and postconviction counsel could not have been ineffective for not pursuing them. These parts of Claim 1(A)(3) will be denied as procedurally defaulted.

## XXII.  Ineffective Assistance for Failing to Object to Evidence of Prior "Convictions" (Claim 22)

In Claim 22, Petitioner argues that trial counsel was ineffective for failing to object to the prosecutor calling his prior offenses "convictions." For two of these prior offenses, Petitioner received suspended impositions of sentence, which means they were not technically "convictions" under Missouri law. *Yale v. City of Indep.*, 846 S.W.2d 193, 196 (Mo. banc 1993). Petitioner raised this ineffectiveness claim in his amended postconviction motion but not on postconviction appeal, so it is procedurally defaulted. (Doc. 95, Oral Arg. Tr. at 99; Amended PCR Motion, Doc. 29-12 at 94-95; Doc. 29-13, PCR Appellant's Br.); *Jolly v. Gammon*, 28 F.3d 51, 53 (8th Cir. 1994). Petitioner seeks to invoke *Martinez* to excuse the procedural default, but the Eighth Circuit has held that *Martinez* cannot be used to excuse ineffective assistance of postconviction *appellate* counsel. (Doc. 95, Oral Arg. Tr. at 94, 99); *Arnold v. Dormire*, 675 F.3d 1082, 1087 (8th Cir. 2012).

Petitioner argues that a later Supreme Court case, *Davila v. Davis*, 137 S. Ct. 2058 (2017), undermines *Arnold*. (Doc. 95, Oral Arg. Tr. at 96-97.) In *Davila*, the Supreme Court held that *Martinez* does not extend beyond claims of ineffective assistance of trial counsel to claims of ineffective assistance of direct-appeal counsel. 137 S. Ct. at 2065-67. In doing so, the Supreme Court re-emphasized that *Martinez* applies only to claims involving *trial* error. *Id.* Petitioner now turns that emphasis on its head and insists this means *Martinez* now applies to *all* claims involving trial error. The Court disagrees. *Davila* did not address the issue here. To the contrary, *Davila*

noted that the "chief concern" in *Martinez* was for one court to review a claim of trial error, at a minimum. *Id.* at 2067. This is consistent with the conclusion in *Arnold* that "deprivation of a second day [in court] does not constitute cause" under *Martinez*. *Arnold*, 675 F.3d at 1087. Here, the state postconviction motion court addressed this claim, and the default happened between the trial court level and the appellate court level of state postconviction review. Under *Arnold*, Petitioner cannot invoke *Martinez*. Therefore, Claim 22 will be denied as procedurally defaulted.

## XXIII.    Prosecutorial Misconduct During the Prosecutor's Opening Statement and Closing Argument (Claim 23)

In Claim 23, Petitioner argues that the prosecutor committed misconduct during his opening statement and closing argument. Petitioner concedes that the opening statement part of this claim is procedurally defaulted. (Doc. 95, Oral Arg. Tr. at 90-91, 94.) Trial counsel also did not object to the prosecutor's closing argument at trial, but Petitioner contends this part of the claim is preserved because the Supreme Court of Missouri reviewed some of the same arguments for plain error on direct appeal. *See State v. Dorsey*, 318 S.W.3d at 656-57. This is insufficient to cure the procedural default of failing to object at trial. Under *Hayes v. Lockhart*, 766 F.2d 1247, 1253 (8th Cir. 1985), "a federal habeas court cannot reach an otherwise unpreserved and procedurally defaulted claim merely because a reviewing state court analyzed that claim for plain error." *Clark v. Bertsch*, 780 F.3d 873, 874 (8th Cir. 2015).

*Clark* resolved a split among Eighth Circuit panel decisions on this issue and held "that *Hayes* . . . governs in our circuit" because it is the earliest relevant case. *Id.* Petitioner argues that *Clark* and *Hayes* are trumped by a prior Eighth Circuit case, *Dietz v. Solem*, 640 F.2d 126 (8th Cir. 1981), which states that a default may be cured "where a state court has reached the merits of the issue presented." (Doc. 86 at 51; Doc. 95, Oral Arg. Tr. at 94-95.) However, *Dietz* does not address whether *plain error* review is enough of a merits review to cure a procedural default. *See Deck v. Steele*, 249 F. Supp. 3d 991, 1021-22 (E.D. Mo. 2017) (rejecting the same argument raised here). Furthermore, although *Dietz* could arguably be read to conflict with the rule set out in *Hayes* and followed in *Clark*, it does not conflict with *Clark*'s holding that *Hayes* provides the governing rule in the Eighth Circuit. This Court is bound to follow that holding.

For the same reasons, there is no merit to Petitioner's argument that *Clark* was wrongly decided due to various Supreme Court cases that were handed down between *Hayes* and *Clark*. (Doc. 86 at 51 (citing *Harris v. Reed*, 489 U.S. 255, 257-66 (1989), *Ylst v. Nunnemaker*, 501 U.S.

797, 801 (1991), and *Coleman v. Thompson*, 501 U.S. 722, 737 (1991)); Doc. 95, Oral Arg. Tr. at 95 (citing *Engle v. Isaac*, 456 U.S. 107, 125 n.44 (1982), which suggests in dicta that plain error review could cure a procedural default).) None of these Supreme Court cases hold that plain error review cures a procedural default, and these cases were already on the books when *Clark* was decided. *Clark* is binding and on point, and this Court is not at liberty to disregard it.

Petitioner does not attempt to invoke *Martinez*, assert any other "cause," or plead a gateway claim of actual innocence to excuse the procedural default for this claim. *See Murphy v. King*, 652 F.3d 845, 849-50 (8th Cir. 2011). Therefore, Claim 23 will be denied as procedurally defaulted.

## XXIV. Ineffective Assistance for Failing to Object to Prosecutorial Misconduct During the Opening Statement (Claim 24)

In Claim 24, Petitioner argues that trial counsel was ineffective for not objecting to the prosecutor's assertions during his opening statement that (1) Petitioner's sperm was in Sarah Bonnie's vagina, (2) there was a bleach stain on the carpet next to her body, and (3) Petitioner was a three-time felony offender. (Doc. 25 at 375-78; Trial Tr. at 514, 519-20.) Claim 24 is procedurally defaulted. (Doc. 95, Oral Arg. Tr. at 90-91, 95-97.)

Petitioner raised the sperm and felony-offender components of this ineffectiveness claim in the amended postconviction motion, and the postconviction motion court rejected them. (*Id.* at 95-97; Doc. 29-12 at 88-91, 191-92.) However, Petitioner did not pursue these arguments on postconviction appeal. (Doc. 29-13, PCR Appellant's Br.) Accordingly, Petitioner cannot use *Martinez* to excuse the default for the sperm and felony-offender parts of this claim. *Arnold*, 675 F.3d at 1087.

The bleach part of this claim is insubstantial under *Martinez*. Trial counsel was not deficient for not raising an objection to the prosecutor's comment about a bleach stain on the carpet because this was not prosecutorial misconduct. "A jury is permitted to draw, and counsel may suggest, inferences that are supported by the facts." *United States v. Crumley*, 528 F.3d 1053, 1065 (8th Cir. 2008).

Here, the prosecutor's comment about bleach was a fair projection of what the evidence would show. Like with Claim 21(B), Petitioner argues that trial counsel should have objected because of lab reports stating that the swab from the pour pattern had no odor and that there was a faint odor on the carpet sample not recognized as bleach. (Pet. App. at 3553-54.) However, the reports also noted the "evaporative nature" of bleach as the reason for not running tests and

"apparent color bleached areas" on the carpet sample.  (*Id.*)  Furthermore, Detective Nichols testified about a strong odor of bleach on Sarah Bonnie's side of the room, a bleach bottle in the bathroom sink, a pour pattern on her mid-section and groin area, and a discolored or bleached-out spot on the carpet next to her.  (Trial Tr. at 672-76, 679, 685-87.)  Accordingly, this part of Claim 24 has no merit, and postconviction counsel could not have been ineffective for not pursuing it.

Therefore, Claim 24 will be denied as procedurally defaulted.

XXV.     **Ineffective Assistance for Failing to Object to Prosecutorial Misconduct During Closing Argument (Claim 25)**

In Claim 25, Petitioner argues that trial counsel was ineffective for failing to object to various comments during the prosecutor's closing argument.  This claim is procedurally defaulted.  (*See* Doc. 95, Oral Arg. Tr. at 97.)  Petitioner seeks to invoke *Martinez* to excuse the default, but this claim is insubstantial.

The prosecutor stated as follows in his reply to defense counsel's closing argument:

MR. AHSENS: Justice for the whole person, talking about the defendant.  You heard those words, didn't you?

Folks, justice is not just for the defendant.  Certainly, justice as to what the sentence should be for the defendant is part of it.  But justice is for more than just punishing the defendant.

Justice reassures the citizens that the criminal justice system is working properly.  And, yes, it is even available to avenge the dead.  All of that is a part of justice.  It's not just the defendant.  His background and all of that is a factor.  But from what you just heard, you'd believe it was all you were supposed to look at.

It isn't.  Let's not lose track of what we're dealing with here.

. . . .

The question is: Given everything you know, what is the appropriate punishment for this man and this case, taking all of the facts into consideration?  Because these acts and the repercussions of those acts on these families is evil.  And make no mistake, friends, there is evil in the world.

A much smarter man than I am once said, "The only thing necessary for evil to triumph is for good men to do nothing."

Well, what I'm afraid of is, if you do not come back with the most severe penalty, it will have the impact of having done nothing.

. . . .

Folks, you're going to have both choices here.  And the question is whether you're going to do what is necessary.

I think what you heard from the defense is a very eloquent plea for mercy. And that's a fine thing. It's what they should have done. But I want you to keep something in mind.

Mercy is something that is granted to the weak and the innocent by the strong. You're strong in the sense that, as a group, you have the power to render sentence in this case. So you are the strong, I suppose.

But when you talk about the weak and the innocent, that man does not qualify.

Do your duty.

(Trial Tr. at 1023-24, 1026, 1028-29.)

Petitioner argues that trial counsel was ineffective for not objecting to the prosecutor's comments (1) that "justice is not just for the defendant;" (2) that "justice is for more than just punishing the defendant;" (3) that "justice reassures the citizens that the criminal justice system is working properly;" (4) that not coming "back with the most severe penalty" will have the effect of "do[ing] nothing;" (5) that the jurors are the "strong," but Petitioner does not "qualify" as the weak or innocent; (6) and to "do [their] duty." (Trial Tr. at 1023, 1026, 1029.) Petitioner argues that these comments were aimed at removing reason and responsibility from the sentencing process and encouraging the jury to use "the conscience of the community as a guiding principle for punishment" instead of making an individualized sentencing decision in violation of *Caldwell v. Mississippi*, 472 U.S. 320 (1985), *Weaver v. Bowersox*, 438 F.3d 832, 837, 841 (8th Cir. 2006), *Antwine v. Delo*, 54 F.3d 1357 (8th Cir. 1995), and *Newlon v. Armontrout*, 885 F.2d 1328 (8th Cir. 1989).

Under the Eighth Amendment, the prosecutor's comments did not diminish the jury's sense of responsibility in violation of *Caldwell*. This case is unlike *Caldwell*, where the prosecutor told the jury that a death sentence would be reviewed on appeal. It is also unlike *Antwine*, where the prosecutor assured the jury that the defendant's execution would be instantaneous, and *Weaver*, where the prosecutor compared jurors to soldiers with a "duty to kill" and described "a graphic story from a movie" about a general's charge to potential conscientious objectors during war. Here, the prosecutor did not encourage the jury to feel "less responsible than it should for the sentencing decision." *Romano v. Oklahoma*, 512 U.S. 1, 9 (1994). Although he argued that a death sentence was "necessary" and told the jurors to "do [their] duty," he also told them they were "going to have both choices" and suggested they had discretion in their decision by telling them

they had the "power to render sentence in this case." Counsel was not deficient for not objecting to these comments.

Under the Due Process Clause of the Fourteenth Amendment, although trial counsel could have raised valid objections to some of the prosecutor's comments, Petitioner was not prejudiced. Specifically, trial counsel could have objected to the prosecutor using "the conscience of the community as a guiding principle for punishment," *Weaver*, 438 F.3d at 837, 841, telling the jury to "do [its] duty," *United States v. Young*, 470 U.S. 1, 18, (1985), and suggesting through a famous quote that assessing a life without parole sentence would be the equivalent of "good men" doing "nothing," *see People v. Clemons*, 89 P.3d 479, 483 (Colo. App. 2003) (finding harmless error for using this quote and collecting other cases).

However, there is not a reasonable probability that objecting to these improper comments would have led to a different result. The prosecutor was correct to point out that the defendant's circumstances are not the only relevant considerations. Although it was improper to broaden the scope of argument to the community's broader interest, the circumstances of the crime itself were relevant, and so was the impact on the victims' families. *Antwine*, 54 F.3d at 1364 (circumstances of the crime); *Storey v. Roper*, 603 F.3d 507, 518 (8th Cir. 2010) (victim-impact evidence relevant to a limited extent). Even with a successful objection to these comments, the prosecutor still could have properly focused on the rape, the killing of two people at once, the monetary motive, and to some extent, the effect on the victims' families. Accordingly, there is not a reasonable probability that Petitioner would have obtained a life sentence with a proper objection to these comments.

Claim 25 has no merit, and postconviction counsel could not have been ineffective for not pursuing it under *Martinez*. Therefore, Claim 25 will be denied as procedurally defaulted.

## XXVI. Instructional Error Under *Ring v. Arizona* (Claim 26)

In Claim 26, Petitioner argues that Instructions 7 and 9 were improper under *Ring v. Arizona*, 536 U.S. 584 (2002) because they did not require the jury to apply the beyond-a-reasonable-doubt standard in weighing the aggravating circumstances against the mitigating circumstances.

### A. Procedural Default

This claim is procedurally defaulted because trial counsel did not object on this basis at trial. (Trial Tr. 993-96; Doc. 95, Oral Arg. Tr. at 100-08.) The Supreme Court of Missouri

reviewed this claim on direct appeal, but only for plain error, *State v. Dorsey*, 318 S.W.3d at 652-53, which did not cure the procedural default under *Clark*, 780 F.3d at 874.

Petitioner argues that the default was cured by additional intervening state proceedings. After Petitioner filed this case, the Supreme Court handed down *Hurst v. Florida*, 136 S. Ct. 616, 622 (2016), which struck down under *Ring* Florida's practice of allowing judges to make the critical findings for imposing the death penalty. While this case was pending, Petitioner filed a motion in the Supreme Court of Missouri based on *Hurst* to recall the direct-appeal mandate, and that court requested a response from the State. (Doc. 49 at 2.)

Due to the intervening state proceedings, the judge previously assigned to this case concluded that Petitioner's *Hurst* claim was arguably not exhausted and then granted Petitioner a *Rhines* stay. (Doc. 55 at 2.) Ultimately, the Supreme Court of Missouri denied Petitioner's motion to recall the mandate in an unexplained order "without prejudice to filing a petition for a writ of habeas corpus" under Missouri Rule 91. (Doc. 58-1.) Petitioner then filed a Missouri Rule 91 habeas petition, which the Supreme Court of Missouri denied in another unexplained order 41 days after it was filed.[18] (Doc. 65-1); *State ex rel. Dorsey v. Griffith*, No. SC96440 (Mo. banc 2017). Petitioner argues that the state court's additional review of his *Hurst* claim was a sufficient merits review to remove the procedural default for Claim 26. The Court disagrees.

Although "[s]tate procedural bars . . . may expire because of later actions by state courts." *Ylst*, 501 U.S. at 801, "there is simply no reason to construe an unexplained Rule 91 denial as opening up the merits of a previously defaulted federal issue." *Byrd v. Delo*, 942 F.2d 1226, 1232 (8th Cir. 1991). The Court "must 'look through' the unexplained state court order to the last reasoned decision." *Oxford v. Delo*, 59 F.3d 741, 745 (8th Cir. 1995). Absent "strong evidence" to the contrary, where "the last reasoned opinion on the claim explicitly imposes a procedural default, [the Court] will presume that a later decision rejecting the claim did not silently disregard that bar and consider the merits." *Ylst*, 501 U.S. at 803. "Strong evidence" may include "extensive briefing limited to the merits of the federal claim," among other things. *Id.* at 804-05.

Here, the last reasoned opinion addressing this claim was the Supreme Court of Missouri's direct-appeal opinion, which acknowledged the procedural default by reviewing for plain error. *Dorsey v. State*, 318 S.W.3d at 652-53; *Deck v. State*, 68 S.W.3d 418, 427-28 (Mo. banc 2002)

---

[18] The date of filing of the state habeas petition is not in this Court's record, but the Court takes judicial notice through Missouri Casenet that the petition was pending for only 41 days.

(plain-error review applies only when the error is not properly preserved for appeal).  Petitioner does not proffer any "strong evidence" that the state court disregarded the procedural bar and addressed the merits of his motion to recall the mandate or state habeas petition.  Although the state court requested briefing from the State on the motion to recall the mandate, the request was not "limited to the merits."  *Ylst*, 501 U.S. at 804.  Furthermore, the Supreme Court of Missouri has discretion in determining whether to recall its mandate and does so only under limited circumstances, such as when appellate counsel was ineffective (which is not alleged here) or when an intervening United States Supreme Court decision directly conflicts with the state court's decision (which is not the case here regarding *Hurst*, for the reasons discussed below).  *State v. Whitfield*, 107 S.W.3d 253, 265 (2003), *overruled on other grounds by State v. Wood*, ___ S.W.3d. ___, No. SC96924, 2019 WL 3144027 (Mo. banc July 16, 2019).  Likewise, a state writ of habeas corpus "is limited and generally cannot be utilized to raise procedurally barred claims, such as those that could be raised on direct appeal or in a post-conviction proceeding."  *State ex rel. Clemons v. Larkins*, 475 S.W.3d 60, 76 (Mo. banc 2015).

Accordingly, Petitioner has failed to rebut the presumption that the state court imposed the procedural default during the intervening proceedings.  *Ylst*, 501 U.S. at 804.  Petitioner does not attempt to invoke *Martinez* to excuse the procedural default for this claim.  Therefore, Claim 26 will be denied as procedurally defaulted.

## B.     Merits Review Under § 2254(d)(1)

This claim would fail even if the Court were to reach the merits.  Under *Wilson v. Sellers*, this Court must "look through" the state court's unexplained decisions "to the last related state-court decision that does provide a relevant rationale" and "presume that the unexplained decision[s] adopted the same reasoning."   138 S. Ct. 1188, 1193-96 (2018).  Petitioner argued to the state court on direct appeal that Instructions 7 and 9 "failed to require the state to prove beyond a reasonable doubt that the evidence in aggravation outweighs the mitigation evidence."[19] *State v. Dorsey*, 318 S.W.3d at 653.  The state court rejected this claim under plain error review

---

[19] Instructions 7 and 9 stated as follows: "if you have unanimously found beyond a reasonable doubt that one or more of the statutory aggravating circumstances . . . exists, you must then determine whether there are facts or circumstances in mitigation of punishment which are sufficient to outweigh facts and circumstances in aggravation of punishment," and if so, enter a verdict of life without parole.  (Doc. 29-3 at 182, 185.)

because the weighing of aggravation and mitigation evidence "is not a factual finding that increases the potential range of punishment" subject to the reasonable-doubt standard. *Id.*

This was a reasonable application of *Ring* and its progeny. *Ring* struck down Arizona's practice of allowing a sentencing judge to find aggravating circumstances supporting a death sentence and held that capital defendants "are entitled to a jury determination of any fact on which the legislature conditions an increase in their maximum punishment." 536 U.S. at 589. *Hurst* applied the same rule to strike down Florida's hybrid procedure, which required the jury to issue an advisory verdict but then left to the sentencing judge the ultimate findings necessary for a death sentence. 136 S. Ct. at 621. Under these decisions, any fact (other than a prior conviction) on which the legislature conditions an increase in the maximum punishment is an "element" that must "be proved to a jury beyond a reasonable doubt." *Id.*; *Ring*, 536 U.S. at 600.

The Missouri statute underlying the "weighing-step" instruction stated as follows:

The trier shall assess and declare the punishment at life imprisonment without eligibility for probation, parole, or release except by act of the governor:

> (1) If the trier finds by a preponderance of the evidence that the defendant is mentally retarded; or
>
> (2) If the trier does not find beyond a reasonable doubt at least one of the statutory aggravating circumstances set out in subsection 2 of section 565.032; or
>
> (3) If the trier concludes that there is evidence in mitigation of punishment, including but not limited to evidence supporting the statutory mitigating circumstances listed in subsection 3 of section 565.032, which is sufficient to outweigh the evidence in aggravation of punishment found by the trier; or
>
> (4) If the trier decides under all of the circumstances not to assess and declare the punishment at death. If the trier is a jury it shall be so instructed.

Mo. Rev. Stat. § 565.030.4(3) (2008).

The third step is the weighing step. It can be characterized in two competing ways. It requires either (1) a factual finding that the aggravators outweigh or equal the mitigators before moving on to the final, discretionary decision between death and life without parole; or (2) a conclusion that the jury must reach based on a balancing of facts it has already found. Petitioner points to *State v. Whitfield*, 107 S.W.3d 253, 265 (Mo. banc 2003), which held that the weighing step requires a factual finding that must be found by a jury, and *McLaughlin v. Steele*, 173 F. Supp. 3d 855 (E.D. Mo. 2016), which relied on *Whitfield*. In contrast, the Supreme Court of Missouri

recently overruled the relevant part of *Whitfield* and held that the weighing step does not require a finding of elemental fact by a jury. *Wood*, 2019 WL 3144027 at *13.

The state court's characterization of the weighing step is not dispositive of the federal constitutional question. *See Ring*, 536 U.S. at 602 ("If a State makes an increase in a defendant's authorized punishment contingent on a finding of fact, that fact—no matter how the state labels it—must be found by a jury beyond a reasonable doubt."). Given the wealth of competing case law on this issue, the Court cannot say that the state court's holding was an unreasonable application of *Ring*. *See Wood*, 2019 WL 3144027 at *13 & nn.12-13 (collecting competing cases); *United States v. Coonce*, 932 F.3d 623, 645 (8th Cir. 2019) (The "weighing component of the [Federal Death Penalty Act] is not an elemental fact."); *Kansas v. Carr*, 136 S. Ct. 633, 642 (2016) ("[W]e doubt whether it is even possible to apply a standard of proof to the mitigating-factor determination. . . . [T]he ultimate question whether mitigating circumstances outweigh aggravating circumstances is mostly a question of mercy . . . ."). Therefore, this claim would fail even if the Court were to reach the merits.

## XXVII.     Ineffective Assistance for Failing to Object to Instructional Error Under the Individualized Sentencing Requirement (Claim 27)

In Claim 27, Petitioner argues that trial counsel was ineffective for failing to object to Instruction 10 because it allowed the jury to consider evidence pertaining to both counts in making the final decision whether to impose death or life without parole. This claim is procedurally defaulted because trial counsel did not object on this basis at trial. (Trial Tr. 993-96.) The Supreme Court of Missouri reviewed this claim on direct appeal, but only for plain error, *State v. Dorsey*, 318 S.W.3d at 652, which did not cure the procedural default under *Clark*, 780 F.3d at 874. Petitioner attempts to invoke *Martinez* to excuse the default. (Doc. 95, Oral Arg. Tr. at 100-01.) However, under *Arnold*, 675 F.3d at 1087, *Martinez* does not apply because Petitioner raised this claim to the postconviction motion court but defaulted it between the motion court stage and the subsequent postconviction appeal. (Doc. 29-12 at 96-99, 195-96; Doc. 29-13, PCR Appellant's Br.) Therefore, Claim 27 will be denied as procedurally defaulted.

## XXVIII.     Cumulative Error (Claim 28)

In Claim 28, Petitioner argues that the cumulative effect of the errors alleged in the Petition resulted in prejudice and violated the Sixth, Eighth, and Fourteenth Amendments. Petitioner concedes that this claim is foreclosed by Eighth Circuit precedent. *See, e.g.*, *Hall v. Luebbers*, 296

F.3d 685, 692-93 (8th Cir. 2002) ("In our circuit a habeas petitioner cannot build a showing of prejudice on a series of errors, none of which would by itself meet the prejudice test."). Accordingly, Claim 28 will be denied on the merits.

## XXIX. Motion for Leave to Expand the Record and for an Evidentiary Hearing

On August 13, 2019, Petitioner filed a motion for leave to expand the record to include certain affidavits and for an evidentiary hearing. (Doc. 100.)

### A. Request to Expand the Record

Petitioner seeks to expand the record to include affidavits from an investigator and a psychologist to support his arguments that trial counsel should have introduced (regarding Claim 13) additional mitigation evidence from family members, friends, and former teammates, and (regarding Claim 16) additional mitigation evidence of adjustment to incarceration and a low probability of prison violence. The State objected to including these affidavits in the record on hearsay grounds, among other reasons. (Doc. 102.) Petitioner filed a reply. (Doc. 103.)

The Court agrees with the State that the proffered affidavits are inadmissible hearsay. Although evidence in a habeas corpus proceeding "may be taken . . . in the discretion of the judge[] by affidavit" under 28 U.S.C. § 2246 and Rule 7 of the Rules Governing § 2254 Cases, this practice is "disfavored because the affiants' statements are obtained without the benefit of cross-examination and an opportunity to make credibility determinations." *Herrera v. Collins*, 506 U.S. 390, 417 (1993). Here, Petitioner has not argued any hearsay exception or exemption to justify admission of the affidavits (Doc. 103), and the Court sees no reason to deviate from the Federal Rules of Evidence. Accordingly, Petitioner's request to expand the record will be denied.[20]

### B. Request for an Evidentiary Hearing

"In deciding whether to grant an evidentiary hearing, a federal court must consider whether such a hearing could enable an applicant to prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief." *Schriro v. Landrigan*, 550 U.S. 465, 474 (2007). The court may deny a hearing if it "would not assist in the resolution of [the petitioner's] claim[s]." *Johnston v. Luebbers*, 288 F.3d 1048, 1059 (8th Cir. 2002). Here, all of Petitioner's

---

[20] Even if the Court were to expand the record to include these affidavits for purposes of the *Martinez* analysis, they would not alter the Court's decision that Claims 13 and 16 are insubstantial under *Martinez*. The Court has reviewed the proffered affidavits and finds them to be largely cumulative of the evidence already proffered in the Petition for Claims 13 and 16.

claims involve ascertaining matters of fact clearly documented by the record. Because an evidentiary hearing would not assist the Court in resolving Petitioner's claims, his request for an evidentiary hearing will be denied.[21]

**XXX.         Certificate of Appealability**

Under 28 U.S.C. § 2253(c)(2), the Court may issue a certificate of appealability only where a petitioner "has made a substantial showing of the denial of a constitutional right." This requires showing that "reasonable jurists" would find the Court's decision to be "debatable or wrong." *Tennard v. Dretke*, 542 U.S. 274, 282 (2004) (quotation marks and citations omitted). For the reasons above, Petitioner has not met this standard.

**Conclusion**

For the foregoing reasons, Petitioner's motion for leave to expand the record and for an evidentiary hearing is **DENIED** (Doc. 100); the Petition is **DENIED** (Doc. 25); a certificate of appealability is **DENIED**; and the case is **DISMISSED**.

**IT IS SO ORDERED**.

s/ Roseann A. Ketchmark
ROSEANN A. KETCHMARK, JUDGE
DATED:  September 27, 2019          UNITED STATES DISTRICT COURT

---

[21] As a result, the Court need not address whether § 2254(e)(2) bars an evidentiary hearing in this case.